## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND
**(Southern Division)**

| | |
|---|---|
| ROGER MIRAGLIA, Individually and On Behalf of All Others Similarly Situated, 788 17th Avenue Menlo Park, CA 94025<br><br>Plaintiff,<br><br>vs.<br><br>HUMAN GENOME SCIENCES INC., 14200 Shady Grove Road Rockville, MD 20850, (Montgomery County)<br><br>and<br><br>H. THOMAS WATKINS 4705 Monaco Circle Bethesda, MD 20814, (Montgomery County)<br><br>and<br><br>TIMOTHY C. BARABE 855 Jones Street San Francisco, CA 94109,<br><br>and<br><br>A.N. KARABELAS 461 Court St. Portsmouth, NH 03801,<br><br>RICHARD J. DANZIG 3670 Upton Street NW. Washington, DC 20008,<br><br>and<br><br>JURGEN DREWS 6983 Bridgestone Court Naples, FL 34108, | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

and

MAXINE GOWEN
19 Paper Mill Road
Newton Square, PA 19073,

and

TUAN HA-NGOC
8 Kitson Park Dr.
Lexington, MA 02421,

and

JOHN L. LAMATTINA
973 Fell Street # 973
Baltimore, MD 21231,
(Baltimore City)

and

AUGUSTINE LAWLOR
11 Carriage Lane
Salem, NH 03079,

and

DAVID P. SOUTHWELL
350 Main Street
Concord, MA 01742,

and

ROBERT C. YOUNG
150 Lynnebrook Lane
Philadelphia, PA 19118,

and

GLAXOSMITHKLINE PLC
980 Great West Road Brentford
Middlesex, ENG TW8 9GS
United Kingdom,

                                Defendants.

## INTRODUCTION AND OVERVIEW

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the publicly traded securities of Human Genome Sciences Inc. ("HGS" or the "Company") between July 20, 2009 and November 11, 2010 (the "Class Period"), who were damaged thereby (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading registration statements and prospectuses (collectively, the "Registration Statements") issued in connection with the Company's July 28, 2009 public offering of 26.7 million shares of common stock at $14 and its December 2, 2009 public offering of 17.8 million shares of common stock at $26.75 (the "Offerings"). This action asserts claims against HGS, its senior executives and directors and GlaxoSmithKline plc ("GSK") (collectively, "defendants").

2.      HGS is a commercially focused biopharmaceutical company. During the Class Period, defendants made materially false and misleading statements concerning a potential new drug, Benlysta, also called belimumab, for the treatment of Systemic Lupus Erythematosus ("SLE"), which is a chronic, life-threatening autoimmune disease. Specifically, defendants failed to disclose that in clinical drug trials they conducted, Benlysta was associated with suicide.

3.      On November 12, 2010, the U.S. Food and Drug Administration ("FDA") posted its analysis of Benlysta on the Internet. In that analysis, investors learned for the first time of the association between Benlysta and suicide in the clinical trials.

4.      As a result of this disclosure, the price of HGS's common stock dropped from a closing price of $26.48 on November 11, 2010 to close at $23.60 on November 12, 2010, a decline of over 10%. This decrease was a result of the artificial inflation caused by defendants' misleading statements coming out of the price.

5.      Meanwhile, HGS had sold 44.5 million shares of its common stock to the public and received approximately $850 million in net proceeds.

3

## JURISDICTION AND VENUE

6.      The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b 5 promulgated thereunder by the SEC (17 C.F.R. §240.10b 5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act.

8.      Venue is proper pursuant to §27 of the 1934 Act.  The Company is located in this District, and the false and misleading statements were made in this District.

## THE PARTIES

9.      Plaintiff Roger Miraglia purchased HGS securities during the Class Period as set forth in the attached Certification and was damaged thereby.

10.     Defendant HGS is a biopharmaceutical company with its headquarters located in Rockville, Maryland.  HGS's common stock is traded under the symbol HGSI on the NASDAQ, which is an efficient market.

11.     Defendant H. Thomas Watkins ("Watkins") was, at all relevant times, Chief Executive Officer ("CEO") and Director of the Company.  In addition to issuing other public statements and speaking publicly during the Class Period, Watkins signed or authorized the signing of the false and misleading Registration Statements.

12.     Defendant Timothy C. Barabe ("Barabe") was, at all relevant times, Chief Financial Officer ("CFO") and Senior Vice President of the Company.  In addition to issuing other public statements and speaking publicly during the Class Period, Barabe signed or authorized the signing of the false and misleading Registration Statements.

13.     Defendant A.N. Karabelas, Ph.D. ("Karabelas") was, at all relevant times, Chairman of the Board and Director of the Company.  In addition to issuing other public statements and speaking publicly during the Class Period, Karabelas signed or authorized the signing of the false and misleading Registration Statements.

4

14.     Defendant Richard J. Danzig ("Danzig") was, at all relevant times, a Director of the Company. Danzig signed or authorized the signing of the false and misleading Registration Statements.

15.     Defendant Jurgen Drews, M.D. ("Drews") was, at all relevant times, a Director of the Company. Drews signed or authorized the signing of the false and misleading Registration Statements.

16.     Defendant Maxine Gowen, Ph.D. ("Gowen") was, at all relevant times, a director of the Company. Gowen signed or authorized the signing of the false and misleading Registration Statements.

17.     Defendant Tuan Ha-Ngoc ("Ha-Ngoc") was, at all relevant times, a director of the Company. Ha-Ngoc signed or authorized the signing of the false and misleading Registration Statements.

18.     Defendant John L. LaMattina, Ph.D. ("LaMattina") was, at all relevant times, a director of the Company. LaMattina signed or authorized the signing of the false and misleading Registration Statements.

19.     Defendant Augustine Lawlor ("Lawlor") was, at all relevant times, a director of the Company. Lawlor signed or authorized the signing of the false and misleading Registration Statements.

20.     Defendant David P. Southwell ("Southwell") was, at all relevant times, a director of the Company. Southwell signed or authorized the signing of the false and misleading Registration Statements.

21.     Defendant Robert C. Young, M.D. ("Young") was, at all relevant times, a director of the Company. Young signed or authorized the signing of the false and misleading Registration Statements.

22.     The defendants referenced above in ¶¶11-21 are referred to herein as the "Individual Defendants."

23.     Defendant GSK is a pharmaceutical company headquartered in Middlesex, England.

5

**SCIENTER**

24.     During the Class Period, the defendants had both the motive and the opportunity to conduct fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, the defendants participated in a scheme to defraud and committed acts and practices and participated in a course of business that operated as a fraud or deceit on purchasers of HGS securities during the Class Period.

**BACKGROUND**

25.     SLE is a chronic, life-threatening autoimmune disease. Approximately five million people worldwide, including approximately 1.5 million in the United States, suffer from various forms of lupus, including SLE. Lupus can occur at any age, but appears mostly in people aged 15 to 45. About 90% of those diagnosed with lupus are women. African-American women are about three times more likely to develop lupus, and it is also more common in Hispanic, Asian, and American Indian women. Symptoms may include extreme fatigue, painful and swollen joints, unexplained fever, skin rash and kidney problems. Lupus can lead to arthritis, kidney failure, heart and lung inflammation, central nervous system abnormalities, inflammation of the blood vessels and blood disorders.

26.     Belimumab is an investigational human monoclonal antibody drug that specifically recognizes and inhibits the biological activity of B-lymphocyte stimulator, or BLyS®. BLyS is a naturally occurring protein discovered by HGS that is required for the development of B-lymphocyte cells into mature plasma B cells. Plasma B cells produce antibodies, the body's first line of defense against infection. In lupus and certain other autoimmune diseases, elevated levels of BLyS are believed to contribute to the production of autoantibodies – antibodies that attack and destroy the body's own healthy tissues. The presence of autoantibodies appears to correlate with disease severity.

27.     Between October 2003 and February 2006, HGS conducted a Phase 2 placebo-controlled, double blind clinical study of Benlysta code-named L02. When that study was complete,

6

another study, LBSL99, began to track the patients who participated in study L02. LBSL99 continues to this day.

28.     In August 2006, HGS and GSK entered into a definitive co-development and co-commercialization agreement under which HGS had responsibility for conducting the belimumab Phase 3 trials, with assistance from GSK. The companies agreed to share equally in Phase 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement.

29.     The Phase 3 development program for belimumab includes two double-blind, placebo-controlled, multi-center Phase 3 superiority trials – BLISS-52 and BLISS-76 – to evaluate the efficacy and safety of belimumab plus standard of care, versus placebo plus standard of care, in serologically active (*i.e.*, autoantibody-positive) patients with SLE. This was the largest clinical trial program ever conducted in lupus patients. BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America, and Eastern Europe. BLISS-76 enrolled and randomized 826 patients at 133 clinical sites in 19 countries, primarily in North America and Europe.

30.     The BLISS-52 study began in May of 2007 and ended in July 2009. The BLISS-76 study began in December 2006 and ended in October 2010.

31.     A "shelf registration statement" is a filing with the SEC to register a public offering of an issuer's securities either on a delayed or continuous basis rather than an intent to immediately sell all the securities being registered for sale. Shelf offerings are governed by Rule 415 of Regulation C of the Securities Act of 1933. In the case of a shelf registration statement filed by an established issuer such as HGS on Form S-3, the registration statement is filed with the SEC and declared effective but incorporates by reference the issuer's reports filed under the 1934 Act after the shelf's effective date. This enables issuers to use a registration statement that became effective before the occurrence of material developments in its business to conduct a public stock offering, without being required to file a post-effective amendment before conducting a public stock offering.

7

32.     On November 28, 2008, HGS and the Individual Defendants filed a shelf registration

statement (Registration No. 333-155769) registering for sale up to $400 million of HGS securities

that was amended April 29, 2009 and declared effective by the SEC on May 4, 2009 (the "Shelf

Registration Statement"). The Shelf Registration Statement was signed by Individual Defendants

Watkins, Barabe, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell, and

Young and expressly stated: "We incorporate by reference any filings we make with the SEC after

the date of this prospectus under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act," and any

subsequently-filed prospectuses.

### FALSE AND MISLEADING
### STATEMENTS DURING THE CLASS PERIOD

33.     On July 20, 2009, HGS and GSK issued a press release that stated in relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – July 20, 2009** – Human Genome
Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that
BENLYSTA™ (belimumab, formerly LymphoStat-B®) met the primary endpoint in BLISS-
52, the first of two pivotal Phase 3 trials in patients with serologically active systemic lupus
erythematosus (SLE). In the placebo-controlled BLISS-52 study, the results showed that
belimumab plus standard of care achieved a clinically and statistically significant
improvement in patient response rate at Week 52, compared with standard of care alone.
Study results also showed that belimumab was generally well tolerated, with adverse event
rates comparable between belimumab and placebo treatment groups.

"The BLISS-52 results demonstrated that BENLYSTA has the potential to become the first
new approved drug in decades for people living with systemic lupus," said H. Thomas
Watkins, President and Chief Executive Officer, HGS. "Given the limited treatment options
currently available, patients would benefit greatly from potential new treatments.
BENLYSTA is an outstanding example of the type of treatment HGS is working to develop
and bring to patients. Assuming positive results in November from our second Phase 3 trial
of BENLYSTA, we and GSK plan to submit marketing applications in the United States,
Europe and other regions in the first half of 2010."

34.     On July 29, 2009, HGS filed a pricing prospectus with the SEC indicating it had

pulled down from its $400 million shelf and sold 23,215,000 shares of its common stock at $14 per

share (the "July Registration Statement"). The July Registration Statement expressly incorporated

by reference the July 20, 2009 press release and any filings made by HGS subsequent to the July

Registration Statement.

35.     On August 3, 2009, HGS issued a press release that stated in relevant part:

ROCKVILLE, Maryland – August 3, 2009 – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 26,697,250 newly issued shares of its common stock at a price to the public of $14.00 per share, which includes 3,482,250 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $356.7 million, after deducting the underwriting discount and estimated offering expenses.

Goldman, Sachs & Co. and Citigroup Global Markets Inc. acted as joint book-running managers for the offering and Credit Suisse Securities (USA) LLC and J.P. Morgan Securities Inc. acted as co-managers for the offering.

36.     On October 20, 2009, HGS and GSK issued a press release that stated in relevant

part:

ROCKVILLE, Maryland, and LONDON, UK – October 20, 2009 – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-52, the first of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The data, which will be presented today in Philadelphia at the 73rd Annual Scientific Meeting of the American College of Rheumatology (ACR), demonstrate that, in BLISS-52, belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also show that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-52 Phase 3 results presented at ACR demonstrate that the efficacy of treatment with BENLYSTA plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "These data were statistically significant and were strongly supported across multiple measures of clinical effect and multiple time-points. Of note, a greater percentage of patients receiving BENLYSTA were able to reduce their use of steroids."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "We have been pleased by the consistency of benefit demonstrated by belimumab in the BLISS-52 study, and we hope to confirm these results in the second Phase 3 study which is to report shortly. We very much hope that we will be able to deliver a new option for the treatment of this debilitating disease." Belimumab is an investigational drug and the first in a new class of drugs called BLyS-specific inhibitors. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

37.     On October 29, 2009, HGS amended the Shelf Registration Statement.   The amendment to the Shelf Registration Statement expressly incorporated by reference the July 20th and August 3rd releases and any subsequently filed prospectuses and was signed by Individual Defendants Watkins, Barabe, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, Southwell and Young.

38.     On November 2, 2009, HGS and GSK issued a joint press release that stated in

relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – November 2, 2009** – Human Genome
Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that
BENLYSTA™ (belimumab) met the primary endpoint in BLISS-76, the second of two
pivotal Phase 3 trials in seropositive patients with systemic lupus erythematosus (SLE).
BLISS-76 study results through 52 weeks showed that belimumab 10 mg/kg plus standard of
care achieved a statistically significant improvement in patient response rate as measured by
the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study
results also showed that belimumab was generally well tolerated, as demonstrated by a
similar rate of discontinuations due to adverse events across treatment groups, with overall
adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-76 results confirm our view that BENLYSTA has the potential to become the
first new approved drug in decades for people living with systemic lupus," said H. Thomas
Watkins, President and Chief Executive Officer, HGS. "We take great pride in the
innovation and scientific rigor that has made it possible to bring BENLYSTA to this point.
We plan to submit marketing applications in the first half of 2010, following discussions
with regulatory authorities in the United States, Europe and other regions. We will continue
to work with GSK to advance this drug to the market where it may benefit patients with
significant need."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "The results
from this second pivotal Phase 3 trial reinforce our belief that belimumab could deliver a
significant therapeutic option for patients with lupus who have had no new treatment in fifty
years. We look forward to continuing our collaboration with HGS in order to bring this
important medicine to patients."

39.     On December 2, 2009, HGS filed the Prospectus with the SEC, which stated in

relevant part:

BENLYSTA

        BENLYSTA is a BLyS-specific inhibitor. We are developing BENLYSTA with GSK
under a co-development and co-commercialization agreement entered into in August 2006.
The Phase 3 development program for BENLYSTA includes two double-blind, placebo-
controlled, multi-center Phase 3 superiority trials — BLISS-52 and BLISS-76 — to evaluate
the efficacy and safety of BENLYSTA plus standard of care, versus placebo plus standard of
care, in seropositive patients with SLE. This is the largest clinical trial program ever
conducted in lupus patients. BLISS-52 randomized and treated 865 patients at 90 clinical
sites in 13 countries, primarily in Asia, South America and Eastern Europe. BLISS-76
randomized and is treating 819 patients at 136 clinical sites in 19 countries, primarily in
North America and Europe. The design of the two trials is similar, but the duration of
therapy in the two studies is different — 52 weeks for BLISS-52 and 76 weeks for BLISS-
76. We designed the Phase 3 program for BENLYSTA in collaboration with GSK and
leading international SLE experts, and the program is being conducted under a Special
Protocol Assessment agreement with the FDA.

BLISS-52

On July 20, 2009, we, together with GSK, announced that BENLYSTA met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 clinical trials in patients with serologically positive SLE. Based on an intention-to-treat analysis, BENLYSTA met its primary efficacy endpoint of superiority versus placebo at Week 52. A clinically and statistically significant improvement was shown in patient response rate for BENLYSTA plus standard of care versus placebo plus standard of care: 57.6% for 10 mg/kg BENLYSTA, 51.7% for 1 mg/kg BENLYSTA, and 43.6% for placebo (p=0.0006 and p=0.011 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo). Patient response was defined by an improvement in SELENA SLEDAI (a weighted cumulative index of lupus disease activity) score of 4 points or greater, no clinically significant BILAG (a clinical measure of lupus disease activity) worsening, and no clinically significant worsening in the Physician's Global Assessment (a measure of disease activity in clinical trials). Results for each individual component of the patient response rate were consistent with the overall improvement shown for the primary endpoint.

Results for pre-specified major secondary efficacy endpoints were:

• A significantly greater percentage of patients receiving BENLYSTA achieved a reduction in SELENA SLEDAI score of at least 4 points by Week 52, with 58.3% for 10 mg/kg BENLYSTA, 53.1% for 1 mg/kg BENLYSTA, and 46.0% for placebo (p=0.0024 and p=0.019 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo).

• Improvement in the Physician's Global Assessment at Week 24 was greatest in the 10 mg/kg BENLYSTA treatment group versus placebo (p=0.0003 for 10 mg/kg and p=0.27 for 1 mg/kg BENLYSTA, respectively) with improvement observed within four to eight weeks.

• A higher percentage of patients in both BENLYSTA treatment groups, versus placebo, had their average prednisone dose reduced by at least 25% from baseline to 7.5 mg per day or less during the last 12 weeks of study (p=0.053 for 10 mg/kg and p=0.025 for 1 mg/kg BENLYSTA, respectively versus placebo).

• Improvement in health-related quality of life at Week 24 as measured by the SF-36 Physical Component Summary ("PCS") (a survey for measuring health status and health-related quality of life) score was not significantly different among treatment groups. However, although not a major secondary endpoint, improvement in the SF-36 PCS score at Week 52 was significantly greater in both BENLYSTA treatment groups (p=0.025 for 10 mg/kg and p=0.027 for 1 mg/kg BENLYSTA, respectively versus placebo).

Study results also showed that BENLYSTA was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between BENLYSTA and placebo treatment groups. Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on BENLYSTA. The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between BENLYSTA and the placebo treatment groups. No malignancies were reported.

40.    On December 3, 2009, defendants filed a pricing prospectus with the SEC indicating

HGS had pulled down from its $400 million shelf for sale another 15,500,000 shares of its common

stock, this time at $26.75 per share (the "December Registration Statement"). The December

Registration Statement expressly incorporated by reference the July 20th, August 3rd, October 20th,

November 2nd and December 2nd press releases and any filings made by HGS subsequent to the

December Registration Statement.

41.    On December 8, 2009, HGS issued a press release that stated in relevant part:

**ROCKVILLE, Maryland – December 8, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 17,825,000 newly issued shares of its common stock at a price to the public of $26.75 per share, which includes 2,325,000 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $456.3 million, after deducting the underwriting discount and estimated offering expenses.

42.    On April 20, 2010, HGS and GSK issued a joint press release that stated in relevant

part:

**ROCKVILLE, Maryland, and LONDON, UK – April 20, 2010 [note correction below made April 21, 2010]** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced topline secondary endpoints from BLISS-76, the second of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). BENLYSTA 10 mg/kg already met its primary efficacy endpoint at Week 52 in both BLISS-52 and BLISS-76, as announced in July and November 2009.

At Week 76 in the BLISS-76 study, belimumab plus standard of care showed higher response rates compared with placebo plus standard of care as measured by the SLE Responder Index; however, this secondary endpoint did not reach statistical significance. Study results also showed that belimumab continued to be generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"A positive overall picture has emerged from our pivotal Phase 3 studies of BENLYSTA, including its achievement of statistical significance on the primary efficacy endpoint at Week 52 with a favorable safety profile in both BLISS-52 and BLISS-76," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We view the results of these studies as strongly supportive of our view that BENLYSTA has the potential to become the first new approved drug in more than 50 years for people living with systemic lupus."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Based on the totality of data in BLISS-52 and BLISS-76, we believe that belimumab could deliver a significant therapeutic option for patients with lupus, a chronic condition which has a devastating effect on the lives of patients living with the disease."

43.     On June 10, 2010, HGS and GSK issued a joint press release that stated in relevant

part:

> **ROCKVILLE, Maryland – June 10, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced that it has submitted a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for approval to market BENLYSTA® (belimumab) for the treatment of systemic lupus erythematosus (SLE).
>
> The BLA submission includes the results of two pivotal Phase 3 clinical trials in autoantibody-positive patients with SLE showing that belimumab met its primary endpoint. In the Phase 3 studies, known as BLISS-52 and BLISS-76, belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated in BLISS-52 and BLISS-76, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups. The design of the two trials was similar, but the duration of therapy in the two studies was different – 52 weeks for BLISS-52 and 76 weeks for BLISS-76. HGS designed the Phase 3 program for belimumab in collaboration with GlaxoSmithKline (GSK) and leading international SLE experts, and in consultation with the FDA. The two studies treated a total of 1,684 patients.

44.     On June 17, 2010, HGS and GSK issued a joint press release that stated in relevant

part:

> **ROCKVILLE, Maryland, and LONDON, UK – June 17, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the presentation of additional results from BLISS-52, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Rome at the 2010 Congress of the European League against Rheumatism (EULAR) on Saturday, June 19.
>
> "The BLISS-52 Phase 3 results presented at EULAR demonstrate that the efficacy of treatment in this study with belimumab plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "Belimumab has met the primary endpoint in both of its pivotal Phase 3 trials. Earlier this month, we and GSK submitted marketing applications for belimumab in the United States and Europe. We now look forward to the consideration and conclusions of regulatory authorities."

45.     On that same day, HGS and GSK issued another joint press release that stated in

relevant part:

> **ROCKVILLE, Maryland, and LONDON, UK – June 17, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA®

(belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The results will be presented today in Rome at the 2010 Congress of the European League Against Rheumatism (EULAR).

"The BLISS-76 Phase 3 results presented at EULAR extend the findings of previous studies and reinforce our belief that belimumab, assuming regulatory approval, could deliver a significant therapeutic option for seropositive patients with systemic lupus," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "In both of its pivotal Phase 3 trials in these patients, belimumab 10 mg/kg met its primary endpoint. The efficacy of treatment with belimumab plus standard of care compared with placebo plus standard of care was superior in both studies, with overall adverse event rates for belimumab comparable to placebo."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Belimumab is the first medicine developed specifically for lupus that has reached this late stage of clinical development with positive results. The BLISS-76 results presented at EULAR, taken together with the results of BLISS-52, reinforce our belief that belimumab may play an important role for patients living with lupus."

46.    On June 25, 2010, HGS issued a press release that stated in relevant part:

**ROCKVILLE, Maryland – June 25, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the presentation of additional results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Vancouver at the 9th International Congress on Systemic Lupus Erythematosus on Friday and Saturday, June 25-26.

"The BLISS-76 Phase 3 results presented at the International Congress on SLE include new data showing that belimumab treatment, consistent with its mechanism of action, resulted in selective and significantly greater reductions in levels of B-cell and plasma B-cell subsets, with significant preservation of memory B-cells," said William W. Freimuth, M.D., Ph.D., Vice President, Clinical Research – Immunology, Rheumatology and Infectious Diseases, HGS. "Importantly, belimumab did not significantly affect the ability of SLE patients to maintain a protective response to vaccines, a finding that is consistent with the preservation of memory B-cells."

47.    On August 19, 2010, HGS and GSK issued a joint press release that stated in relevant

part:

**ROCKVILLE, Maryland – August 19, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that the U.S. Food and Drug Administration (FDA) has granted a priority review designation to BENLYSTA® (belimumab) as a potential treatment for systemic lupus erythematosus (SLE). A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists. The FDA has assigned belimumab a Prescription Drug User Fee Act (PDUFA) target date of December 9, 2010.

The Biologics License Application (BLA) for belimumab was submitted to the FDA on June 9, 2010, and includes the results of two pivotal Phase 3 clinical trials that treated a total of 1,684 autoantibody-positive patients with SLE. HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts, and in consultation with the FDA.

"We are very pleased that FDA has chosen to grant priority review to belimumab, the first in a new class of drugs called BLyS-specific inhibitors," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We believe that the priority review designation speaks both to the significant medical need of people living with lupus and to the potential belimumab may hold as a new treatment option for these patients."

48.     On October 27, 2010, HGS issued a press release announcing the date of a FDA

Advisory Committee meeting regarding Benlysta that stated in relevant part:

In August 2010, the FDA granted a priority review designation to BENLYSTA (belimumab) as a potential treatment for autoantibody-positive patients with clinically active systemic lupus erythematosus (SLE). A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists. The FDA has assigned belimumab a PDUFA target date of December 9, 2010, and an FDA Advisory Committee meeting to consider the belimumab Biologics License Application (BLA) is scheduled to take place on November 16, 2010. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

## DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

49.     Defendants' statements set forth above were materially false and misleading because they failed to disclose that Benlysta was associated with suicide in clinical studies of the drug. Specifically, a patient taking Benlysta in trial L02 committed suicide on November 27, 2003. Another patient taking Benlysta committed suicide in study LBS99 on April 13, 2006. Finally, a third patient taking Benlysta in the BLISS-52 trial committed suicide on October 5, 2008. Two other patients in trial LBSL99 attempted suicide in December of 2008 and June of 2009. No patients taking placebos in any of these trials attempted or committed suicide.

## THE TRUTH BEGINS TO COME TO LIGHT

50.     In anticipation of the FDA Advisory Committee hearing scheduled for November 16, 2010, the FDA posted its briefing documents for that meeting on the Internet on November 12, 2010. That document stated in relevant part:

There were two completed suicides across the double-blind placebo controlled studies, both in patients treated with belimumab (one each in study L02 and study C1057). In addition there was another completed suicide in a belimumab treated patient during the safety extension period of study L02 (study L99). There were four cases of suicide attempts or suicidal ideation, all in patients treated with belimumab (one each in placebo-controlled studies L02 and C1057, and two in the safety extension period of study L02 called study L99).

* * *

Clearly there is a need for effective therapies in SLE. However whether belimumab's benefits sufficiently outweigh its risks is the crux of the issue. Given that flares and steroid reduction may not be impacted, is a reduction of 4 points in the SELENASLEDAI (the main component driving Study 1056's efficacy result) clinically meaningful? If belimumab only has a modest effect for some patients and manifestations, *is a possible increased risk of death, infection, or neuropsychiatric adverse effects worth the potential benefit?*

[Emphasis added.]

51.     As a result of this disclosure, the price of HGS's securities dropped from closing price of $26.48 to $23.60 the next day, a decline of over 10%. This decrease in the price of HGS's securities was a result of the artificial inflation caused by defendants' misleading statements coming out of the price.

## LOSS CAUSATION/ECONOMIC LOSS

52.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market. This artificially inflated the price of HGS's securities and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of HGS's securities fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of HGS securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

53.     HGS's verbal "Safe Harbor" warnings accompanying its oral forward-looking statement(s) ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

54.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

16

authorized and/or approved by an executive officer of HGS who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD ON THE MARKET

55.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased HGS securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

56.     At all relevant times, the market for HGS securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, HGS filed periodic public reports with the SEC; and

(b)     HGS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

17

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly traded securities of HGS during the Class Period (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading July and December Registration Statements. Excluded from the Class are defendants, directors and officers of HGS and their families and affiliates.

58.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. HGS had more than 180 million shares outstanding, owned by thousands of persons.

59.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the prices of HGS securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

60.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

18

61.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act
and Rule 10b-5 Against the Individual Defendants, HGS, and GSK**

63.     Plaintiff repeats and realleges each and every allegation contained above.

64.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

     (a)     employed devices, schemes, and artifices to defraud;

     (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

     (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of HGS securities during the Class Period.

66.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HGS securities. Plaintiff and the Class would not have purchased HGS securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

67.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of HGS securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants and HGS

68.    Plaintiff repeats and realleges each and every allegation contained above.

69.    The Individual Defendants acted as controlling persons of HGS within the meaning of §20(a) of the 1934 Act. By virtue of their positions and their power to control public statements about HGS, the Individual Defendants had the power and ability to control the actions of HGS and its employees. HGS controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  November 10, 2011


                                        /s/
                                        _____
                                        Dana W. McKee (04447)
                                        dwm@browngold.com
                                        Gregory P. Care (29040)
                                        gpc@browngold.com
                                        BROWN, GOLDSTEIN & LEVY LLP

120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
(410) 962-1030
(410)385-0869 (fax)

David R. Scott
(Upon *Pro Hac Vice* Application)
drscott@scott-scott.com
SCOTT+SCOTT LLP
156 South Main Street
Colchester , CT 06415
(860) 537-3818
(860) 537-4432 (fax)

Mary K. Blasy
(Upon *Pro Hac Vice* Application)
mblasy@scott-scott.com
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565
(619) 233-0508 (fax)

*Attorneys for Plaintiff*