**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**



| | |
|---|---|
| _____ X | Civil Action No. 8:11-cv-03231-RWT |
| *In re Human Genome Sciences Inc.* *Securities Litigation* | CLASS ACTION |
| _____ | AMENDED CONSOLIDATED COMPLAINT |
| **THIS DOCUMENT RELATES TO:** | |
| **ALL ACTIONS** | DEMAND FOR JURY TRIAL |
| X | |

**INTRODUCTION AND OVERVIEW**

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the publicly traded securities of Human Genome Sciences Inc. ("HGS" or the "Company") between July 20, 2009 and November 11, 2010 (the "Class Period"), who were damaged thereby (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading registration statements and prospectuses (collectively, the "Registration Statements") issued in connection with the Company's July 28 and December 2, 2009 public offerings of common stock (the "Offerings").  This action asserts claims against HGS, certain of its senior executives, as well as GlaxoSmithKline plc ("GSK") (collectively, "defendants").

2.      HGS is a commercially focused biopharmaceutical company. During the Class Period, defendants made materially false and misleading statements concerning a potential new drug, Benlysta®, also called belimumab, for the treatment of Systemic Lupus Erythematosus ("SLE"), which is a chronic, life-threatening autoimmune disease.  Specifically, defendants touted the safety of Benlysta, but concealed that the drug was associated with suicide in a number of clinical trials.

3.      Indeed, the very trials that defendants conducted showed the suicide problem.  Between November 27, 2003 and October 5, 2008, three patients taking Benlysta committed suicide in three separate

studies defendants conducted.  Two more patients taking Benlysta in defendants' clinical studies attempted suicide in December of 2008 and June of 2009.  No patients taking placebo in any of these trials attempted or committed suicide.

4.      This association between Benlysta and suicide constituted a "safety signal," which is defined by the World Health Organization ("WHO") as "reported information on a possible causal relationship between an adverse event and a drug, the relationship being unknown or incompletely documented previously."  Rather than disclose this signal, however, defendants told investors that "*we really have seen no significant safety signals*." [Emphasis added.]

5.      Defendants further provided investors with specific data regarding rates for significant adverse events ("SAEs") that were favorable to Benlysta, indicating that the rates were comparable between patients taking the drug and those taking placebo.  Specifically, defendants disclosed SAE rates for infections, infusion reactions, and malignancies that were similar to placebo.  In contrast, Defendants concealed the SAE rates for suicides and suicide attempts, which were far higher in patients taking Benlysta than in those taking placebo.  Nonetheless, defendants told investors that "the serious and severe adverse events, infections, discontinuations due to adverse events, *almost any way you look at it were comparable between BENLYSTA and placebo*." [Emphasis added.]

6.      While defendants were in possession of the unfavorable, undisclosed suicide results, HGS sold over $800 million in HGS stock to investors at artificially inflated prices in two separate public offerings.

7.      Investors did not become aware that Benlysta was associated with suicide until November 12, 2010, when the U.S. Food and Drug Administration ("FDA") posted its analysis of Benlysta on the Internet disclosing the association between Benlysta and suicide in the clinical trials which defendants had concealed.

8.      After the suicide data was finally disclosed, one analyst noted that "[t]he only unexpected safety signal raised in the documents is the higher risk of suicide."  Subsequently, the chairperson of a

committee of independent experts, brought in to advise the FDA, stated that "[o]n a high level, the safety signals [included] . . .  suicide and psychiatric events."

9.      As a result of the disclosure of the suicides and suicide attempts, the price of HGS's common stock dropped from a closing price of $26.48 on November 11, 2010 to close at $23.60 on November 12, 2010, a decline of over 10%.  This decrease was a result of the artificial inflation caused by defendants' misleading statements coming out of the price.

10.     The FDA now requires Benlysta's label (*See* Exhibit A) to warn patients that "Depression and suicidality have been reported in BENLYSTA studies.  Patients should be instructed to contact their healthcare provider if they experience new or worsening depression, suicidal thoughts or other mood changes."

11.     Indeed, based on the exact same suicide results that defendants concealed from investors during the Class Period, defendants' Benlysta website now admits that "Benlysta can cause serious side effects, including . . . suicide . . . Symptoms can include thoughts of suicide or dying, attempting to commit suicide, thoughts of hurting yourself or others, trouble sleeping, new or worsening anxiety or depression, acting on dangerous impulses, and other unusual changes in your behavior or mood."[1]  Although defendants now prominently concede that Benlysta is associated with suicide, they concealed this fact from investors during the Class Period.

## JURISDICTION AND VENUE

12.     The claims alleged herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

---

[1]      http://www.benlysta.com/benlysta-side-effects.html.

13.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act.

14.     Venue is proper pursuant to §27 of the 1934 Act.  The Company is located in this District, and the false and misleading statements were made in this District.

## THE PARTIES

15.     Lead Plaintiff Davin Pokoik purchased HGS securities during the Class Period as set forth in the attached Certification and was damaged thereby.  Mr. Pokoik was appointed lead plaintiff by this Court on March 12, 2012.

16.     Defendant HGS is a biopharmaceutical company with its headquarters located in Rockville, Maryland.  HGS's common stock is traded under the symbol HGSI on the NASDAQ, which is an efficient market.

17.     Defendant H. Thomas Watkins ("Watkins") was, at all relevant times, Chief Executive Officer ("CEO") and a Director of the Company.  As detailed herein, defendant Watkins made false and misleading statements concerning the safety of Benlysta in press releases issued by the Company and at several investor conferences.  In addition, Watkins signed, or authorized the signing of, the false and misleading Registration Statements.

18.     Defendant Barry A. Labinger ("Labinger") was, at all relevant times, Executive Vice President and Chief Commercial Officer of the Company.  As detailed herein, defendant Labinger made false and misleading statements concerning the safety of Benlysta at several investor conferences.

19.     Defendant David P. Southwell ("Southwell") was, at all relevant times, Executive Vice President and Chief Financial Officer of the Company.  As detailed herein, defendant Southwell made false and misleading statements concerning the safety of Benlysta at an investor conference.  In addition, defendant Southwell signed, or authorized the signing of, the false and misleading Registration Statements.

20.     Defendant David C. Stump, M.D. ("Stump") was, at all relevant times, Executive Vice President, Research and Development, of the Company.  As detailed herein, defendant Stump made false

and misleading statements concerning the safety of Benlysta in press releases issued by the Company and during conference calls with securities analysts.

21.     The defendants referenced above in ¶¶17-20 are referred to herein as the "Individual Defendants."

22.     Defendant GSK is a pharmaceutical company headquartered in Middlesex, England that co-developed Benlysta with HGS and now co-markets the drug.  In April 2012, GSK made an unsolicited offer to purchase HGS, an offer which HGS rejected.

## SCIENTER

23.     During the Class Period, the defendants had both the motive and the opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.   In so doing, the defendants participated in a scheme to defraud and committed acts and practices and participated in a course of business that operated as a fraud or deceit on purchasers of HGS securities during the Class Period.

24.     Benlysta was also HGS's most important product.  During the Class Period, HGS had only three products in late stage development: (1) Benlysta; (2) Zalbin, for chronic hepatitis C; and (3) raxibacumab, for inhalation anthrax.  Of these three, Benlysta had, by far, the greatest commercial potential, accounting for 70% of the value of entire Company, according to analysts.

## BACKGROUND

25.     SLE is a chronic, life-threatening autoimmune disease.  Approximately five million people worldwide, including approximately 1.5 million in the United States, suffer from various forms of lupus, including SLE.  Lupus can occur at any age, but appears mostly in people aged 15 to 45.  About 90% of those diagnosed with lupus are women.  African-American women are about three times more likely to develop lupus, and it is also more common in Hispanic, Asian, and American Indian women.  Symptoms may include extreme fatigue, painful and swollen joints, unexplained fever, skin rash, and kidney problems.

Lupus can lead to arthritis, kidney failure, heart and lung inflammation, central nervous system abnormalities, inflammation of the blood vessels, and blood disorders.

26.     Before the Class Period, the only drugs approved to treat lupus were aspirin, approved in 1948, Plaquenil, a malaria drug, and corticosteroids.  Plaquenil and corticosteroids were both approved in 1955.

27.     Benlysta is an investigational human monoclonal antibody drug that specifically recognizes and inhibits the biological activity of B-lymphocyte stimulator, or BLyS.  BLyS is a naturally occurring protein discovered by HGS that is required for the development of B-lymphocyte cells into mature plasma B cells.  Plasma B cells produce antibodies, the body's first line of defense against infection.  In lupus and certain other autoimmune diseases, elevated levels of BLyS are believed to contribute to the production of autoantibodies – antibodies that attack and destroy the body's own healthy tissues.  The presence of autoantibodies appears to correlate with disease severity.

28.     Between October 2003 and February 2006, HGS conducted a Phase 2 placebo-controlled, double blind clinical study of Benlysta, code-named L02.  When that study was complete, HGS began another study, LBSL99, to track the patients who participated in study L02.  LBSL99 continues to this day.

29.     In August 2006, HGS and GSK entered into a definitive co-development and co-commercialization agreement under which HGS had responsibility for conducting the Benlysta Phase 3 trials, with assistance from GSK.  The companies agreed to share equally in Phase 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement.  Pursuant to that agreement, GSK was entitled to, and did receive, the results of all clinical studies of Benlysta.

30.     Pursuant to that agreement (§§3.1-3.4), HGS and GSK established the following joint committees with equal representation:

        (a) A Joint Development Committee (JDC), composed of functional-area representatives experienced in Clinical Studies, clinical operations, regulatory activities, commercialization, and pharmaceutical drug development, to perform the following functions:  "(i) evaluate the scientific and

commercial feasibility for, and direct, any Development of [Benlysta] . . .; (ii) manage and oversee the preparation and implementation of . . . clinical protocol design and endpoint measures for Phase III Clinical Studies and Phase IV Clinical Studies on [Benlysta] … ; (iii) approve the Target Product Profile[2] for [Benlysta], which will include clinical and commercial attributes . . .; (v) determine whether [Benlysta] achieved the mutually agreed Target Product Profile for the relevant indication . . .; (vii) coordinate and monitor regulatory strategy and activities for [Benlysta] . . .;"

      (b)     Global and Regional Joint Marketing Committees to oversee and manage the commercialization of Benlysta;

      (c)     A Joint Manufacturing Committee responsible, at a minimum, for reviewing and approving development expenses associated with Benlysta; and

      (d)     A Joint Steering Committee composed of HGS and GSK representatives at the vice presidential level or above to, among other things, review and approve, when necessary or appropriate, the Development and Marketing Plans for Benlysta.

     31.     In addition, under the agreement (§4.1), GSK was required to provide three expert clinical operations personnel to assist HGS with the enrollment and monitoring of the Phase III clinical trials.  The agreement (§8.4) also required HGS and GSK to form a Product Safety Committee (PSC) composed of HGS and GSK representatives to manage the clinical studies safety data in ongoing clinical trials.  In this regard, the PSC was required to review all available blinded safety data and other safety issues every four months, or more or less frequently, as determined by the committee.  The PSC also had responsibility for (i) maintaining the benefit risk management profile for Benlysta; and (ii) communication of safety issues with the JDC and JSC.

---

2     The agreement defines Target Product Profile as "the description of the commercially relevant range of acceptable product performance of a compound against key characteristics used to shape the progressions and development decisions. . . ." §1.89.

32.     Further, prior to the submission of the first Marketing Approval Application (MAA) in a territory, HGS and GSK were required to agree on the terms of a Safety Data Exchange Agreement to facilitate the management of safety for Benlysta in accordance with standards that were no less stringent than in the ICH Guidelines.[3]  Agreement, §8.4.2.  The co-development and co-commercialization agreement (§§8.2.3 and 8.3.3) also required HGS and GSK to create a master safety database which would cross-reference any Adverse Events relating to Benlysta.[4]

33.     The Phase 3 development program for Benlysta/belimumab included two double-blind, placebo-controlled, multi-center Phase 3 superiority trials – BLISS-52 and BLISS-76 – to evaluate the efficacy and safety of Benlysta/belimumab, plus standard of care, versus placebo, plus standard of care, in serologically active (*i.e.*, autoantibody-positive) patients with SLE.  This was the largest clinical trial program ever conducted in lupus patients.  BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America, and Eastern Europe.  BLISS-76 enrolled and randomized 826 patients at 133 clinical sites in 19 countries, primarily in North America and Europe.

34.     Defendants began the BLISS-52 study in May of 2007 and ended it in July 2009.  Defendants began the BLISS-76 study in December 2006 and ended it in October 2010.

35.     A "shelf registration statement" is a filing with the SEC to register a public offering of an issuer's securities either on a delayed or continuous basis rather than an intent to immediately sell all the

---

[3]     ICH is the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, which has produced a comprehensive set of safety guidelines to uncover potential risks from pharmaceuticals including carcinogenicity, genotoxicity and reprotoxicity.

[4]     The agreement defined Adverse Event to mean "any untoward medical occurrence in a patient or clinical investigation subject administered [Benlysta] which does not necessarily have to have a causal relationship with this administration.  An Adverse Event can therefore be any unfavorable and unintended sign (including an abnormal laboratory finding), a symptom or disease temporally associated with the use of [Benlysta], whether or not considered related to [Benlysta]."  The agreement also provided that "all spontaneously reported Adverse Events involving [Benlysta] sold as a marketed product should be considered Adverse Drug Reactions (implied causal relationship) for regulatory reporting purposes."  §1.3.

securities being registered for sale.  Shelf offerings are governed by Rule 415 of Regulation C of the Securities Act of 1933.  In the case of a shelf registration statement filed by an established issuer such as HGS on Form S-3, the registration statement is filed with the SEC and declared effective, but incorporates by reference the issuer's reports filed under the 1934 Act after the shelf's effective date.  This enables issuers to use a registration statement that became effective before the occurrence of material developments in its business to conduct a public stock offering, without being required to file a post-effective amendment before conducting a public stock offering.

36.     On November 28, 2008, HGS and the Individual Defendants filed a shelf registration statement (Registration No. 333-155769) registering for sale up to $400 million of HGS securities that was amended April 29, 2009 and declared effective by the SEC on May 4, 2009 (the "Shelf Registration Statement").  The Shelf Registration Statement was signed by defendants Watkins and Southwell and expressly stated: "We incorporate by reference any filings we make with the SEC after the date of this prospectus under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act," and any subsequently-filed prospectuses.

## CLASS PERIOD EVENTS

37.     On July 20, 2009, HGS and GSK issued a press release that stated in relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – July 20, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTA™ (belimumab, formerly LymphoStat-B®) met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 trials in patients with serologically active systemic lupus erythematosus (SLE).  In the placebo-controlled BLISS-52 study, the results showed that belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate at Week 52, compared with standard of care alone.  Study results also showed that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-52 results demonstrated that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS.  "Given the limited treatment options currently available, patients would benefit greatly from potential new treatments.  BENLYSTA is an outstanding example of the type of treatment HGS is working to develop and bring to patients.  Assuming positive results in November from our second Phase 3 trial

of BENLYSTA, we and GSK plan to submit marketing applications in the United States, Europe and other regions in the first half of 2010."

***

In BLISS-52, belimumab was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between belimumab and placebo treatment groups. Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on belimumab. The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between belimumab and placebo treatment groups. No malignancies were reported.

38.    On that same day, defendants held a conference call to discuss Benlysta. On that call, defendant Stump stated that, "with respect to safety, I am pleased to say that Benlysta was generally well tolerated. Rates of overall adverse events, serious events, infections and fatalities were all comparable between Benlysta and placebo treatment groups."

39.    In response to this disclosure, HGS common stock price rocketed from $3.32 per share to $12.51 in one day, an increase of over 270%.

40.    Analyst reports emphasized the importance of the safety findings. A July 20, 2009 analyst report by Piper Jaffray stated that, "[t]his morning, HGS announced positive Phase II data for Benlysta . . . . We see this as a game-changing event and huge positive for HGS . . . Due to the clean safety profile, we expect Benlysta to be broadly used in the lupus setting." Similarly, a July 21, 2009 report by Bernstein Research stated that, "Benlysta is . . . distinguished by its excellent safety and tolerability. More than 50% of the patients treated in earlier studies remain on open label extension arms of the prior studies, with many now out to 5 years on drug, and the rate of serious adverse events and particularly infections was the same in the active [drug-taking] and control [placebo] arms of this trial."

41.    On July 29, 2009, HGS filed a pricing prospectus with the SEC for the sale of 23,215,000 shares of its common stock at $14 per share (the "July Registration Statement"). The July Registration Statement expressly incorporated by reference the July 20, 2009 press release and any filings made by HGS subsequent to the July Registration Statement.

42.    On August 3, 2009, HGS issued a press release that stated in relevant part:

**ROCKVILLE, Maryland – August 3, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 26,697,250 newly issued shares of its common stock at a price to the public of $14.00 per share, which includes 3,482,250 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $356.7 million, after deducting the underwriting discount and estimated offering expenses.

43.     On September 9, 2009, defendant Labinger made a presentation to investors at the Thomas Weisel Partners Healthcare Conference, during which he stated in relevant part:

So first turning to BENLYSTA, again potentially the first new lupus drug in 50 years.  This is the primary endpoint that we saw in BLISS-52, the first of our two Phase 3 global trials . . . The safety was very impressive.  No difference in overall adverse events or serious adverse events or infections, which were a category of interest for us.  No difference in fatalities across those groups for BENLYSTA and placebo.  You see a list of the common adverse events, but there are no differences between groups and those either.  There were no malignancies reported in the trial overall.  So we're very pleased so far with the safety profile.  We've got patients from our Phase-II program on drugs through four to five years now and see a similar experience and we are obviously diligently track [sic] safety going into the future as we get larger numbers on treatments for longer periods of time.

44.     On September 9, 2009, defendant Labinger also made a presentation to investors at the Robert W. Baird & Co. Healthcare Conference, during which he stated in relevant part:

An important part of the profile of this drug [Benlysta] is the safety.  Because if you think about what's used to treat lupus patients now, there is an opportunity to have some efficacy.  If you give enough steroids and enough immunosuppressants, they will suppress the disease process, along with suppressing the whole rest of the immune system.  The issue is you don't want to be on those drugs for any significant length of time because of all the safety risks that come with them, with long-term use.  And what we see with BENLYSTA in the BLISS-52 study is that the overall adverse event rates were the same.  The serious adverse events were the same.  We took a particular interest in infections, because any time you have any inhibition of any component of the immune system, you want to make sure that you're not increasing the risk of infection.  There was no difference there.  There was no difference in fatalities.  And so ***an incredibly clean safety profile so far***.  Of course, we'll always be diligent about monitoring safety as the drug gets on the market and is used by tens of thousands of patients rather than a couple of thousand.  But for right now, couldn't be much better.

[Emphasis added.]

45.     On September 21, 2009, defendant Watkins made a presentation to investors at the UBS Global Life Sciences Conference, during which he stated in relevant part regarding the BLISS-52 results:

From a safety and tolerability standpoint, we saw rates of overall adverse events which were comparable to placebo and common adverse events which were also comparable to the placebo and no malignancies reported.

46.     On October 20, 2009, HGS and GSK issued a press release that stated in relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – October 20, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-52, the first of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  The data, which will be presented today in Philadelphia at the 73rd Annual Scientific Meeting of the American College of Rheumatology (ACR), demonstrate that, in BLISS-52, belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care.  Study results also show that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-52 Phase 3 results presented at ACR demonstrate that the efficacy of treatment with BENLYSTA plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS.  "These data were statistically significant and were strongly supported across multiple measures of clinical effect and multiple time-points.  Of note, a greater percentage of patients receiving BENLYSTA were able to reduce their use of steroids."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "We have been pleased by the consistency of benefit demonstrated by belimumab in the BLISS-52 study, and we hope to confirm these results in the second Phase 3 study which is to report shortly.  We very much hope that we will be able to deliver a new option for the treatment of this debilitating disease."  Belimumab is an investigational drug and the first in a new class of drugs called BLyS-specific inhibitors.  No new drug for lupus has been approved by regulatory authorities in more than 50 years.

* * *

In BLISS-52, belimumab was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between belimumab and placebo treatment groups.  Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on belimumab.  ***The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between belimumab and placebo treatment groups.***  No malignancies were reported.

[Emphasis added.]

47.     On October 29, 2009, HGS amended the Shelf Registration Statement.  The amendment to the Shelf Registration Statement expressly incorporated by reference the July 20th and August 3rd releases and any subsequently filed prospectuses and was signed by defendant Watkins.

48.     On November 2, 2009, HGS and GSK issued a joint press release that stated in relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – November 2, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTA™ (belimumab) met the primary endpoint in BLISS-76, the second of two

pivotal Phase 3 trials in seropositive patients with systemic lupus erythematosus (SLE). BLISS-76 study results through 52 weeks showed that belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-76 results confirm our view that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We take great pride in the innovation and scientific rigor that has made it possible to bring BENLYSTA to this point. We plan to submit marketing applications in the first half of 2010, following discussions with regulatory authorities in the United States, Europe and other regions. We will continue to work with GSK to advance this drug to the market where it may benefit patients with significant need."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "The results from this second pivotal Phase 3 trial reinforce our belief that belimumab could deliver a significant therapeutic option for patients with lupus who have had no new treatment in fifty years. We look forward to continuing our collaboration with HGS in order to bring this important medicine to patients."

* * *

In BLISS-76, belimumab was generally well tolerated, with rates of overall adverse events, serious and/or severe adverse events, all infections, serious and/or severe infections, and discontinuations due to adverse events comparable between treatment groups receiving belimumab plus standard of care and the treatment group receiving placebo plus standard of care. Serious and/or severe adverse events were reported in 26.8% of patients on belimumab and 24.0% of patients on placebo. Infections were reported in 72.1% of patients on belimumab and 67.3% of patients on placebo. *Serious and/or severe infections were reported in 7.2% of patients on belimumab and 8.0% of patients on placebo. Serious and/or severe infusion reactions were reported in 1.1% of patients on belimumab and 0.7% of patients on placebo.* Discontinuations due to adverse events were 7.2% in the belimumab treatment groups and 7.6% in the placebo treatment group. Malignancies were reported by 2, 3, and 1 subjects in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively. There were three deaths in the study, with 1, 2, and 0 reported in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively.

[Emphasis added.]

49.     On November 2, 2009, J.P. Morgan published an analyst report that stated in relevant part,

"[s]hares of HGSI were up 35% today on the heels of this morning's positive Phase 3 BLISS-76 results."

The report went on to state as follows:

As is probably abundantly clear by now, safety is one of Benlysta's distinguishing attributes. We are comfortable with every aspect of the top-line safety record disclosed for BLISS-76 and more exhaustive review of BLISS-52. Moreover, *we believe it's notable that no disconcerting safety signals have emerged* in the Phase 2 open label extension, where ~ 50% of pts are still on drug 6 years out (accumulated ~ 1,200 pt years).

[Emphasis added.]

50.     On November 18, 2009, defendant Labinger made a presentation to investors at the Lazard

Capital Healthcare Conference, during which he stated in relevant part:

> Important to note that the safety profile that we have seen over time with this molecule has held up quite nicely through the Phase 3 program whereby the serious and severe adverse events, infections, discontinuations due to adverse events, ***almost any way you look at it were comparable between BENLYSTA and placebo***.   And that's a very important contribution to the treatment armamentarium for lupus, as other drugs that can be effective in this disease all carry significant tolerability risks long term.

[Emphasis added.]

51.     On December 2, 2009, HGS filed a Prospectus with the SEC, which stated in relevant part:

BENLYSTA

BENLYSTA is a BLyS-specific inhibitor.  We are developing BENLYSTA with GSK under a co-development and co-commercialization agreement entered into in August 2006.  The Phase 3 development program for BENLYSTA includes two double-blind, placebo-controlled, multi-center Phase 3 superiority trials – BLISS-52 and BLISS-76 – to evaluate the efficacy and safety of BENLYSTA plus standard of care, versus placebo plus standard of care, in seropositive patients with SLE.  This is the largest clinical trial program ever conducted in lupus patients.  BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America and Eastern Europe.  BLISS-76 randomized and is treating 819 patients at 136 clinical sites in 19 countries, primarily in North America and Europe.  The design of the two trials is similar, but the duration of therapy in the two studies is different – 52 weeks for BLISS-52 and 76 weeks for BLISS-76.  We designed the Phase 3 program for BENLYSTA in collaboration with GSK and leading international SLE experts, and the program is being conducted under a Special Protocol Assessment agreement with the FDA.

BLISS-52

On July 20, 2009, we, together with GSK, announced that BENLYSTA met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 clinical trials in patients with serologically positive SLE.  Based on an intention-to-treat analysis, BENLYSTA met its primary efficacy endpoint of superiority versus placebo at Week 52.  A clinically and statistically significant improvement was shown in patient response rate for BENLYSTA plus standard of care versus placebo plus standard of care: 57.6% for 10 mg/kg BENLYSTA, 51.7% for 1 mg/kg BENLYSTA, and 43.6% for placebo (p=0.0006 and p=0.011 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo).  Patient response was defined by an improvement in SELENA SLEDAI (a weighted cumulative index of lupus disease activity) score of 4 points or greater, no clinically significant BILAG (a clinical measure of lupus disease activity) worsening, and no clinically significant worsening in the Physician's Global Assessment (a measure of disease activity in clinical trials).  Results for each individual component of the patient response rate were consistent with the overall improvement shown for the primary endpoint.

Results for pre-specified major secondary efficacy endpoints were:

• A significantly greater percentage of patients receiving BENLYSTA achieved a reduction in SELENA SLEDAI score of at least 4 points by Week 52, with 58.3% for 10 mg/kg BENLYSTA, 53.1% for 1 mg/kg BENLYSTA, and 46.0% for placebo (p=0.0024 and p=0.019 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo).

• Improvement in the Physician's Global Assessment at Week 24 was greatest in the 10 mg/kg BENLYSTA treatment group versus placebo (p=0.0003 for 10 mg/kg and p=0.27 for 1 mg/kg BENLYSTA, respectively) with improvement observed within four to eight weeks.

• A higher percentage of patients in both BENLYSTA treatment groups, versus placebo, had their average prednisone dose reduced by at least 25% from baseline to 7.5 mg per day or less during the last 12 weeks of study (p=0.053 for 10 mg/kg and p=0.025 for 1 mg/kg BENLYSTA, respectively versus placebo).

• Improvement in health-related quality of life at Week 24 as measured by the SF-36 Physical Component Summary ("PCS") (a survey for measuring health status and health-related quality of life) score was not significantly different among treatment groups. However, although not a major secondary endpoint, improvement in the SF-36 PCS score at Week 52 was significantly greater in both BENLYSTA treatment groups (p=0.025 for 10 mg/kg and p=0.027 for 1 mg/kg BENLYSTA, respectively versus placebo).

Study results also showed that BENLYSTA was generally well tolerated, with rates of overall adverse events, *serious adverse events*, infections and fatalities *comparable between BENLYSTA and placebo treatment groups*. Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on BENLYSTA. The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between BENLYSTA and the placebo treatment groups. No malignancies were reported.

[Emphasis added.]

52.     On December 3, 2009, defendants filed a pricing prospectus with the SEC for the sale of another 15,500,000 shares of its common stock, this time at $26.75 per share (the "December Registration Statement"). The December Registration Statement expressly incorporated by reference the July 20th, August 3rd, October 20th, November 2nd, and December 2nd press releases and any filings made by HGS subsequent to the December Registration Statement.

53.     On December 8, 2009, HGS issued a press release that stated in relevant part:

**ROCKVILLE, Maryland – December 8, 2009** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 17,825,000 newly issued shares of its common stock at a price to the public of $26.75 per share, which includes 2,325,000 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $456.3 million, after deducting the underwriting discount and estimated offering expenses.

54.     On December 15, 2009, defendant Labinger made a presentation to investors at the Deutsche

Bank Biotech Boston Confab, during which he stated in relevant part:

> Our drug affects the immune system in a very specific way and as a result, so far, we've seen
> ***a very favorable safety profile***.  But we can't rule out very rare events based on the number
> of patients and duration that we've got so far.  So we'll be very diligent looking forward.

[Emphasis added.]

55.     On January 11, 2010 defendant Watkins made a presentation to investors at the JPMorgan

Healthcare Conference, during which he stated in relevant part, "[t]he safety profile as we have seen over

time with BENLYSTA has held up very well through Phase 3 and we're very excited about what this can

mean for patients."

56.     On March 2, 2010, HGS filed a Form 10-K with the SEC for the year 2009 which stated in

relevant part:

> In 2006, we entered into an agreement with GSK for the co-development and
> commercialization of BENLYSTA.  GSK is a world leader that brings global pharmaceutical
> development and marketing capabilities to the BENLYSTA program.   Under the
> BENLYSTA agreement, we and GSK will share Phase 3 and 4 development costs, sales and
> marketing expenses, and profits equally.  We are conducting Phase 3 clinical trials with
> assistance from GSK, and will have primary responsibility for bulk manufacturing.  We have
> received an execution fee of $24.0 million under this agreement and we are recognizing this
> payment ratably over the estimated remaining development period.  We recognized revenues
> of $6.5 million in 2008 and $4.7 million in 2009.  The GSK BENLYSTA agreement includes
> cost-sharing provisions under which we and GSK share clinical development costs.  We
> recorded cost reimbursement from GSK under this provision of $51.8 million in 2008 and
> $43.1 million in 2009, which was reflected as a reduction in expenses.  This agreement will
> expire three years after the later of (i) the expiration date of certain patent rights related to
> BENLYSTA and (ii) a period of ten years after the first commercial sale of BENLYSTA.
> These certain patent rights are expected to expire by 2023, with the potential for later
> expiration that may result from any issuance of additional patent and/or patent term
> extensions. GSK may terminate the agreement if (i) upon the basis of competent scientific
> evidence or data regarding commercial potential, GSK determines BENLYSTA does not
> merit incurring additional development or marketing expenses or (ii) BENLYSTA is not
> approved by the FDA or EMEA.  In addition, either party may terminate if the other party
> commits a material breach of the agreement or if the other party is bankrupt or insolvent.

57.     On March 10, 2010, defendant Labinger made a presentation to investors at the Cowen &

Company Health Care Conference, during which he stated in relevant part:

> So, if there is a single greatest need in the lupus field it's, give me something that can help
> control this disease that's not going to be tougher to handle the side effects than the disease

itself.  And ***we really have seen no significant safety signals***, we've got a very well tolerated drug at least so far.

[Emphasis added.]

58.    On March 24, 2010, defendant Watkins made a presentation to investors at the Barclays Capital Global Healthcare Conference, during which he stated in relevant part, "[t]he safety profile that we've seen over time with BENLYSTA in fact has been excellent and it held up through the entire Phase 3 program."

59.    On April 13, 2010, J.P. Morgan published an analyst report that stated in relevant part, "Benlysta (lupus) is undoubtedly the chief driver for HGSI shares."  The report further stated that "Benlysta (SLE) is the chief component of HGSI's valuation," accounting for over 70% of the Company's value.

60.    On April 20, 2010, HGS and GSK issued a joint press release that stated in relevant part:

**ROCKVILLE, Maryland, and LONDON, UK – April 20, 2010 [note correction below made April 21, 2010]** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced topline secondary endpoints from BLISS-76, the second of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  BENLYSTA 10 mg/kg already met its primary efficacy endpoint at Week 52 in both BLISS-52 and BLISS-76, as announced in July and November 2009.

At Week 76 in the BLISS-76 study, belimumab plus standard of care showed higher response rates compared with placebo plus standard of care as measured by the SLE Responder Index; however, this secondary endpoint did not reach statistical significance. Study results also showed that belimumab continued to be generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"A positive overall picture has emerged from our pivotal Phase 3 studies of BENLYSTA, including its achievement of statistical significance on the primary efficacy endpoint at Week 52 with a favorable safety profile in both BLISS-52 and BLISS-76," said H. Thomas Watkins, President and Chief Executive Officer, HGS.  "We view the results of these studies as strongly supportive of our view that BENLYSTA has the potential to become the first new approved drug in more than 50 years for people living with systemic lupus."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Based on the totality of data in BLISS-52 and BLISS-76, we believe that belimumab could deliver a significant therapeutic option for patients with lupus, a chronic condition which has a devastating effect on the lives of patients living with the disease."

\*\*\*

In BLISS-76 through 76 weeks, belimumab was generally well tolerated, with rates of overall adverse events, serious and/or severe adverse events, all infections, serious and/or

severe infections, and discontinuations due to adverse events comparable between treatment groups receiving belimumab plus standard of care and the treatment group receiving placebo plus standard of care.  Serious and/or severe adverse events were reported in 29.0% of patients on belimumab and 26.2% of patients on placebo.  ***Infections were reported in 74.3% of patients on belimumab and 69.1% of patients on placebo. Serious and/or severe infections were reported in 7.9% of patients on belimumab and 8.4% of patients on placebo [percentages corrected April 21, 2010]. Serious and/or severe infusion reactions were reported in 1.1% of patients on belimumab and 0.7% of patients on placebo.*** Discontinuations due to adverse events were 7.5% in the belimumab treatment groups and 8.4% in the placebo treatment group.  One new malignancy was reported since the Week 52 data were announced, with a total 2, 4, and 1 subjects in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively.  No additional deaths were reported since the Week 52 data were announced, with a total of three deaths in the study: 1, 2, and 0 reported in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively.

[Emphasis added.]

61.     On that same day, HGS and GSK held a conference call with investment analysts about the

recent study results.  During that call, defendant Stump stated:

I am pleased to say that Benlysta continued to be generally well-tolerated.  Rates of overall adverse events in the BLISS-76 study through 76 weeks, including serious and/or severe adverse events, were comparable between the Benlysta and placebo treatment groups.

***Overall infections, including serious and/or sever infections, as well as discontinuations due to adverse agents, were also comparable to placebo.***

Of course, one can never declare victory on safety until a drug accumulates many patient years of experience and practice, and we will be diligent in following large [d]ose cohorts over long periods of time to track safety issues of interest.

[Emphasis added.]

62.     On May 5, 2010, defendant Southwell made a presentation to investors at the Barclays

Capital Global Healthcare Conference, during which he stated in relevant part, "[i]n total, we've tested in

Phase 3 about 1,700 patients and we've achieved these results while continuing to be well tolerated, and the

safety profile of the drug held up very well through Phase 3 of the [clinical trials]."

63.     On June 10, 2010, HGS and GSK issued a joint press release that stated in relevant part:

**ROCKVILLE, Maryland – June 10, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced that it has submitted a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for approval to market BENLYSTA® (belimumab) for the treatment of systemic lupus erythematosus (SLE).

The BLA submission includes the results of two pivotal Phase 3 clinical trials in autoantibody-positive patients with SLE showing that belimumab met its primary endpoint. In the Phase 3 studies, known as BLISS-52 and BLISS-76, belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of

care.  Study results also showed that belimumab was generally well tolerated in BLISS-52 and BLISS-76, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with ***overall adverse event rates comparable between belimumab and placebo treatment groups***.  The design of the two trials was similar, but the duration of therapy in the two studies was different – 52 weeks for BLISS-52 and 76 weeks for BLISS-76.  HGS designed the Phase 3 program for belimumab in collaboration with GlaxoSmithKline (GSK) and leading international SLE experts, and in consultation with the FDA.  The two studies treated a total of 1,684 patients.

[Emphasis added.]

64.     In support of their BLA, defendants submitted the results of the clinical studies they had

conducted of Benlysta to the FDA, which included the suicide data from studies L02, LBSL99, and

BLISS-52.

65.     On June 15, 2010, defendant Watkins made a presentation to investors at the Goldman Sachs

Global Healthcare Conference, during which he stated in relevant part:

> There was no data we saw in there which did not confirm for us a continued strong therapeutic benefit.  I think of equal importance here is the issue of safety.  We now have, from the Phase 2 study, and we've continued many of those patients, some patients from our Phase 2 study, which was unblinded in '05, have continued on study drug . Now, some have been on study drug now for as much as five, six years, I think we have a few on six years . . . .  We will continue – we show that data every six months at EULAR or ACR.  So, maybe this week, you will see that data.  ***What we see from those patients, as well as from the patients in both of the Phase 3 studies is a very positive safety profile***.  And as you know, one of the areas of concern to physicians, when they prescribe long-term immunomodulatory agents, is what is the impact on the patient's overall well-being over a considerable period of time.  Now we will continue, we must continue to be very diligent in tracking safety on a continual basis, we understand that.  But certainly what we will present – what we have presented to the FDA and the EUA we believe is a very positive profile relative to both efficacy and safety.

[Emphasis added.]

66.     On June 17, 2010, HGS and GSK issued a joint press release that stated in relevant part:

> **ROCKVILLE, Maryland, and LONDON, UK – June 17, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the presentation of additional results from BLISS-52, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  The additional data will be presented in Rome at the 2010 Congress of the European League against Rheumatism (EULAR) on Saturday, June 19.

> "The BLISS-52 Phase 3 results presented at EULAR demonstrate that the efficacy of treatment in this study with belimumab plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS.  "Belimumab has met the primary endpoint in both of its pivotal Phase 3 trials.  Earlier this month, we and GSK submitted marketing applications for belimumab in

the United States and Europe.  We now look forward to the consideration and conclusions of regulatory authorities."

* * *

In BLISS-52, belimumab was generally well tolerated, with rates of adverse events overall, serious and/or severe adverse events, all infections, serious and/or severe infections, and discontinuations due to *adverse events comparable between treatment groups receiving belimumab plus standard of care and the treatment group receiving placebo plus standard of care.*  Serious and/or severe adverse events were reported in 18.5% of patients on belimumab and 16.7% of patients on placebo. *Infections were reported in 67.6% of patients on belimumab and 63.8% of patients on placebo. Serious and/or severe infections were reported in 6.2% of patients on belimumab and 6.3% of patients on placebo.  Serious and/or severe infusion reactions were reported in 1.6% of patients on belimumab and 0.3% of patients on placebo.*  Discontinuations due to adverse events were 5.4% in the belimumab treatment groups and 6.6% in the placebo treatment group.  No malignancies were reported.  A total of 9 deaths were reported in the study: 4, 2, and 3 in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively.

[Emphasis added.]

67.    On that same day, HGS and GSK issued another joint press release that stated in relevant

part:

**ROCKVILLE, Maryland, and LONDON, UK – June 17, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  The results will be presented today in Rome at the 2010 Congress of the European League Against Rheumatism (EULAR).

"The BLISS-76 Phase 3 results presented at EULAR extend the findings of previous studies and reinforce our belief that belimumab, assuming regulatory approval, could deliver a significant therapeutic option for seropositive patients with systemic lupus," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS.  "In both of its pivotal Phase 3 trials in these patients, belimumab 10 mg/kg met its primary endpoint.  The efficacy of treatment with belimumab plus placebo compared with placebo plus standard of care was superior in both studies, with overall adverse event rates for belimumab comparable to placebo."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Belimumab is the first medicine developed specifically for lupus that has reached this late stage of clinical development with positive results.  The BLISS-76 results presented at EULAR, taken together with the results of BLISS-52, reinforce our belief that belimumab may play an important role for patients living with lupus."

* * *

In BLISS-76 through 76 weeks, belimumab was generally well tolerated, with rates of adverse events overall, serious and/or severe adverse events, all infections, serious and/or severe infections, and discontinuations due to adverse events comparable between treatment

groups receiving belimumab plus standard of care and the treatment group receiving placebo plus standard of care. Serious and/or severe adverse events were reported in 29.0% of patients on belimumab and 26.2% of patients on placebo. Infections were reported in 74.3% of patients on belimumab and 69.1% of patients on placebo. Serious and/or severe infections were reported in 7.7% of patients on belimumab and 8.4% of patients on placebo. Serious and/or severe infusion reactions were reported in 1.1% of patients on belimumab and 0.7% of patients on placebo. Discontinuations due to adverse events were 7.5% in the belimumab treatment groups and 8.4% in the placebo treatment group. A total of seven malignancies were reported in BLISS-76: 2, 4, and 1 in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively. A total of three deaths were reported in the study: 1, 2, and 0 in the belimumab 10 mg/kg, belimumab

68.    On June 25, 2010, HGS issued a press release that stated in relevant part:

**ROCKVILLE, Maryland – June 25, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the presentation of additional results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Vancouver at the 9th International Congress on Systemic Lupus Erythematosus on Friday and Saturday, June 25-26.

"The BLISS-76 Phase 3 results presented at the International Congress on SLE include new data showing that belimumab treatment, consistent with its mechanism of action, resulted in selective and significantly greater reductions in levels of B-cell and plasma B-cell subsets, with significant preservation of memory B-cells," said William W. Freimuth, M.D., Ph.D., Vice President, Clinical Research – Immunology, Rheumatology and Infectious Diseases, HGS. "Importantly, belimumab did not significantly affect the ability of SLE patients to maintain a protective response to vaccines, a finding that is consistent with the preservation of memory B-cells."

\* \* \*

In BLISS-76 through 76 weeks, belimumab was generally well tolerated, with rates of adverse events overall, serious and/or severe adverse events, all infections, serious and/or severe infections, and discontinuations due to adverse events comparable between treatment groups receiving belimumab plus standard of care and the treatment group receiving placebo plus standard of care. Serious and/or severe adverse events were reported in 29.0% of patients on belimumab and 26.2% of patients on placebo. Infections were reported in 74.3% of patients on belimumab and 69.1% of patients on placebo. Serious and/or severe infections were reported in 7.7% of patients on belimumab and 8.4% of patients on placebo. Serious and/or severe infusion reactions were reported in 1.1% of patients on belimumab and 0.7% of patients on placebo. Discontinuations due to adverse events were 7.5% in the belimumab treatment groups and 8.4% in the placebo treatment group. A total of seven malignancies were reported in BLISS-76: 2, 4, and 1 in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively. A total of three deaths were reported in the study: 1, 2, and 0 in the belimumab 10 mg/kg, belimumab 1 mg/kg and placebo groups, respectively.

69.    On August 19, 2010, HGS and GSK issued a joint press release that stated in relevant part:

**ROCKVILLE, Maryland – August 19, 2010** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that the U.S. Food and Drug Administration (FDA) has granted a priority review designation to BENLYSTA®

(belimumab) as a potential treatment for systemic lupus erythematosus (SLE).  A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists.  The FDA has assigned belimumab a Prescription Drug User Fee Act (PDUFA) target date of December 9, 2010.

The Biologics License Application (BLA) for belimumab was submitted to the FDA on June 9, 2010, and includes the results of two pivotal Phase 3 clinical trials that treated a total of 1,684 autoantibody-positive patients with SLE.  HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts, and in consultation with the FDA.

"We are very pleased that FDA has chosen to grant priority review to belimumab, the first in a new class of drugs called BLyS-specific inhibitors," said H. Thomas Watkins, President and Chief Executive Officer, HGS.  "We believe that the priority review designation speaks both to the significant medical need of people living with lupus and to the potential belimumab may hold as a new treatment option for these patients."

70.     On September 13, 2010, defendant Watkins made a presentation to investors at the Morgan

Stanley Global Healthcare Unplugged Conference, during which he stated in relevant part:

So I think they're going to be very pleased with the body of data that they see, both in terms of effect and equally important in terms of safety.  Recall that our Phase II study that we did, which had landed in 2005 was a 449-patient study.  Nearly 200 or 50% of those patients, 250 of those patients, are still on long-term rollover trial.  These were – a voluntary extension trial which the patients could move onto.  So we have a safety database that extends, in the case of some patients, back – some patients have been on therapy for approaching seven years now.

Obviously, we want a much bigger patient database as we move out of registration into marketing.  But certainly for a drug that's still experimental, if you will, to have some patients have been on drug for that long a time offers us and regulators an excellent window into how the drug will perform on a long-term basis.  And *we're very confident that this drug does well on a safety basis*.  *I think that's going to be a very important feature of commercialization.*

[Emphasis added.]

71.     On October 27, 2010, HGS issued a press release announcing the date of an FDA Advisory

Committee meeting regarding Benlysta that stated in relevant part:

In August 2010, the FDA granted a priority review designation to BENLYSTA (belimumab) as a potential treatment for autoantibody-positive patients with clinically active systemic lupus erythematosus (SLE).  A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists.  The FDA has assigned belimumab a PDUFA target date of December 9, 2010, and an FDA Advisory Committee meeting to consider the belimumab Biologics License Application (BLA) is scheduled to take place on November 16, 2010.  No new drug for lupus has been approved by regulatory authorities in more than 50 years.

## DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

72.     Defendants' statements set forth above were materially false and misleading because they failed to disclose that Benlysta was associated with suicide in clinical studies of the drug.  Specifically, a patient taking Benlysta in trial L02 committed suicide on November 27, 2003.  Another patient taking Benlysta committed suicide in study LBSL99 on April 13, 2006.  Finally, a third patient taking Benlysta in the BLISS-52 trial committed suicide on October 5, 2008. Two other patients in trial LBSL99 attempted suicide in December of 2008 and June of 2009.  No patients taking placebos in any of these trials attempted or committed suicide.

## THE TRUTH BEGINS TO COME TO LIGHT

73.     In deciding whether to approve a treatment such as Benlysta, the FDA utilizes a cost-benefit analysis, *i.e.*, ascertains whether the benefits of the treatment outweigh the risks associated with it.  In order to assist in making such determinations, the FDA sometimes asks an advisory committee – a group of independent specialists – to make a recommendation.  Such advisory committees generally meet in public, listen to presentations from the drug sponsor, the FDA, and the public, then discuss the issues at hand and, ultimately, vote on a recommendation.  The FDA is not required to follow the recommendations of its advisory committees, but usually does so.

74.      In this case, the FDA arranged for its Arthritis Advisory Committee to consider defendants' Benlysta/belimumab application on November 16, 2010.  Prior to the committee meeting, investment analysts believed that the FDA's approval of Benlysta/belimumab was a foregone conclusion.  For example, a November 4, 2010 analyst report from RBC Capital Markets was entitled, "FDA Briefing Documents and Panel Coming Up; We Think It Will Go Well," and further stated that "we think positive panel approval could move stock to $30+."  A November 10, 2010 J.P. Morgan report stated that, "[w]e are still optimistic ahead of Benlysta's Nov 16 AdCom."

75.     Analysts were also pleased by Benlysta's purported safety profile.  A November 10, 2010 report by Summer Street Research Partners stated that "One of the most positive aspects of Benlysta treatment is the lack of adverse events, even over the five-year follow-up of the phase II lupus patients."

76.     Prior to advisory committee meetings, the committee members receive briefing packages from the FDA and the drug sponsor – in this case, the defendants – setting forth their analyses of the relevant study results.  It is the practice of the FDA to post both the FDA and sponsor briefing documents on the Internet a few days before advisory committee meetings.  Accordingly, the FDA posted the defendants' briefing document and the FDA's briefing document on its website on November 12, 2010.

77.     The FDA's briefing document revealed for the first time that Benlysta/belimumab was associated with an increased risk of suicide:

> There were two completed suicides across the double-blind placebo controlled studies, both in patients treated with belimumab (one each in study L02 and study C1057).  In addition there was another completed suicide in a belimumab treated patient during the safety extension period of study L02 (study L99).  There were four cases of suicide attempts or suicidal ideation, all in patients treated with belimumab (one each in placebo-controlled studies L02 and C1057, and two in the safety extension period of study L02 called study L99).

> * * *

> **_The risks associated with belimumab include infection, malignancy, suicidality, and overall number of deaths with a numerical imbalance that favored placebo treatment over belimumab treatment._**

[Emphasis added.]

78.     The FDA briefing document contained narratives describing the completed and attempted suicides as follows:

- Study LBSL02: Subject US034-002 was a 43-year-old white female with SLE.  She received 2 doses of belimumab 1.0 mg/kg IV, on 23Oct03 and 07Nov03 . . . .  Ongoing medical conditions included fibromyalgia, osteoporosis, chronic sinusitis, hypertension, esophageal dyskinesia, depression . . .  On 27Nov03, the subject was considered to have worsening depression and committed suicide by a self-inflicted gunshot.

- Study 1057: Subject KR008-001 was a 23-year-old Asian female with SLE. She received her 1st dose of 10.0 mg/kg belimumab on 07Jan08 and received 11 doses . . . . When she missed her Week 40 visit, the study coordinator contacted the subject's family. The subject's mother informed the coordinator that the subject had committed suicide on 05Oct08 because of a conflict with her father. The subject did not have any mental illness as diagnosed by a psychiatrist; however, she had a period of a depressive mood in 2006. She had not been in a depressive state during the period that the suicide occurred.

- Study LBSL99 (open-label extension of LBSL02): Subject US023-005 was a 65 year-old white female with SLE. She received her 1st dose of 10.0 mg/kg belimumab on 15Mar04 and completed both the 52-week treatment phase and the 24-week extension phase at that dosage. She continued to receive 10.0 mg/kg belimumab in LBSL99 (starting on 27Sep05). The subject's last dose of belimumab was on 21Mar06 . . . . In the morning of 15Apr06, the subject was found dead in bed. It initially appeared that she had taken all of her remaining anti-hypertensive medications. The site confirmed that the subject had no history of depression and no ongoing AEs. The subject was scheduled to receive her next dose of belimumab on 17Apr06. An autopsy report revealed that the subject was found with superficial cuts to the wrists and empty pill bottles. Her death was ascribed to oxycodone and alcohol intoxication.

- Study LBSL99: Subject US006-0008 is a 44-year-old female with systemic lupus erythematosus (SLE) who participated in Study LBSL99. The subject received her first dose of belimumab (1 mg/kg) on 27Jul04 in LBSL02, her first dose of belimumab (10 mg/kg) in the extension phase on 30Aug05, and her first dose of belimumab in LBSL99 on 07Feb06. Medical history is significant for depression, hypertension, obesity, and smoking. No previous psychiatric outpatient or inpatient hospitalizations . . . . On 26Dec08, 21 days after her most recent dose of belimumab, the subject's husband found her sleepy and unresponsive and called the paramedics. She was transported via ambulance to the local hospital . . . . She reportedly took a drug overdose while intoxicated and was subsequently admitted for suicide gesture . . . . The subject reported being lonely, discouraged, and upset with her sister. In addition, she reported stress secondary to family problems. She did not seek out help, but started drinking alcohol (unknown type) and took some pills (not identified and amount not provided by subject). She reported her plan was to hurt herself, although she was vague about a suicidal attempt. She reported not being suicidal, just reaching out for help. She had no delusions and repeatedly denied plans to kill herself. She was not considered psychotic.

- Subject US003-0013 in ongoing long-term extension study LBSL99, receiving 10 mg/kg belimumab, reported depression and suicide attempt on 11 Jun 2009, 1364 days after first dose of belimumab. No further details provided.

- One case of suicidal ideation reported in 1/79 (1.3%) subjects in the 4 mg/kg group of Study LBSL02. No further details were provided.

- One case of "intentional self-injury" was reported in the placebo group of Study 1057: Subject IN004-010 was a 20-year-old Asian female with SLE. She received her 1st dose of placebo on 31Mar08, her last dose on 03Mar09, and she received 13 doses. No medical history was reported. Ongoing conditions included gastritis, vomiting, and depression . . . For a few weeks prior to 16Jul08, the subject had been experiencing increased anger and outbursts. On 16Jul08, 21 days after her 5th dose of placebo, after being questioned and scolded by her father for poor performance on exams, the subject consumed 10 to 15 mL of phenyl with the intention of self harm.

79.    Study 1057 is the study defendants referred to commercially as "Bliss-52." Study LBSL02 was completed in February, 2006 and LBSL99 is the continuation of that study, which defendants referenced in their presentations on September 9, 2009, June 15, 2010, and September 13, 2010.

80.    The FDA report stated that ascertaining the role of Benlysta/belimumab in the completed and attempted suicides was difficult, but that "a promoting or permissive role of belimumab cannot be ruled out." Under "Safety Conclusions," the FDA report stated "Treatment with belimumab appeared to be associated with an increase in death, serious adverse events, infections and serious infections, and neurologic and psychiatric adverse events/serious adverse events, including 3 suicides in belimumab-treated patients through the data cut-offs of the BLA submission. This imbalance holds true even when the incidence of these adverse events is adjusted for exposure."

81.    The briefing document defendants submitted to the FDA specifically addressed the increased rate of suicide observed in Benlysta/belimumab patients, noting that "[t]here were 2 completed suicides in belimumab-treated patients in the primary safety population and another completed suicide in a belimumab patient in LBSL99; there was 1 event of intentional self-harm in a placebo-treated patient, but no completed suicides."

82.    As a result of these disclosures, the price of HGS's securities dropped from a closing price of $26.48 to $23.60 the next day, a decline of over 10%. This decrease in the price of HGS's securities was a result of the artificial inflation caused by the defendants' misleading statements coming out of the price.

83.     The disclosure of the suicide data also reduced the value of Benlysta as a corporate asset. Before the suicide data was made public, the market value of Benlysta was approximately $3.5 billion.  The release of that data reduced the market value of Benlysta by approximately $500 million.

84.     On November 12, 2010, Forbes published an online story about Benlysta/belimumab entitled "Suicide is Surprise in FDA Review of Lupus Drug."  That story stated "the FDA's review turns up an unexpected safety worry: a higher rate of suicide in the patients taking Benlysta."

85.     Another analyst report on November 12, 2010 from Collins Stewart stated:

> This morning, the FDA posted its briefing documents for the Arthritis Advisory committee meeting . . . .  They are also questioning safety signals that have emerged including an increased risk of infection, death, cancer and suicidality . . . .  The only unexpected safety signal raised in the documents is the higher risk of suicide.

86.     Observers attributed the decline in HGS's stock price to the disclosure of the suicide results. For example, on November 15, 2010, *FierceBiotech*, an industry daily, reported that "the key safety issue that seemed to spook investors was the risk of suicide."  Similarly, *BioWorld Today* reported:

> Shares of Human Genome Sciences Inc. tumbled 10.9 percent Friday after FDA drug reviewers questioned whether the modest benefit of Benlysta (belimumab) in treating some lupus patients is worth the potential increased risk of death, infection or adverse neuropsychiatric effects, including suicide.
>
> Regulators also noted that patients with serious systemic lupus erythematosus (SLE) manifestations, such as renal and central nervous system (CNS) lupus, in whom immunosuppressives and other biologics likely will be needed, were excluded from HGSI's Phase III studies, leaving it unclear about the safety of combining Benlysta with other lupus treatments in populations with more serious disease.
>
> Those questions, drug reviewers said in briefing documents released ahead of Tuesday's meeting of the FDA's Arthritis Advisory Committee, have created "dilemmas" for HGSI's biologic license application for Benlysta, which was submitted in June. . . .
>
> Shares of Rockville, Md.-based HGSI (NASDAQ:HGSI) lost $2.88 Friday, to close at $23.60. . . .
>
> JP Morgan analyst Cory Kasimov said the suicidality risk likely was what had investors spooked Friday, noting that the FDA's concern came as somewhat of a surprise to Wall Street. But, he said, "we consider it unlikely that a targeted biologic is increasing suicidality in a patient population already known to be at increased risk."

Nevertheless, given that SLE patients already have a higher documented rate of depression, "it was enough" for the FDA to bring the issue to its panel, Kasimov said.

87.    The Advisory Committee meeting was held on November 16, 2010.  At the meeting, Dr. Kathleen O'Neil, the chairperson of the Advisory Committee, stated, "***On a high level, the safety signals were death, infection, malignancy, suicide and psychiatric events,*** and anaphylaxis . . . .  Common causes of death were infection, suicide, and cardiovascular events."

[Emphasis added.]

88.    Dr. O'Neil went on to state:

The numbers related to completed suicides, suicide attempts, and suicidal ideation, and adverse events of depression are in this slide for your reference.  There were imbalances across all of these events.  The rate of depression and suicides are known to be higher in SLE patients.  Nevertheless, these placebo-controlled studies showed difference between belimumab and placebo.  We ask you to specifically discuss this safety finding.

89.    Dr. Simon Cooper, speaking on behalf of HGS, told the Advisory Committee, that in light of the suicide data, "it is our intention, in our future randomized clinical trials, to include a prospective measure of suicidality."

90.    During the discussion, Dr. Matthew Liang, one of the Advisory Committee members, stated:

The suicidality issue is interesting and I wondered – I heard someone make the case that the best comparator is in a placebo trial and diminished the importance of historical data.  Yet, I think ***I'm aware of at least two studies on suicide and lupus, and I think that there is a little signal there***, that it's more.  I think the expected rate, if you believe those studies, would be something like a little over 1 per 100,000 patient years, and I think the observed data exceeds that.  So being risk aversive and trying to be frank in discussing the tradeoffs with knowledgeable patients, I think you'd have to bring that up.

[Emphasis added.]

91.    Dr.Gabor Illei, another Advisory Committee member, stated "Suicidality, I think it has to be followed."

92.    Ultimately, the Advisory Committee voted to recommend approval of Benlysta/belimumab to the FDA.  However, in light of the comments made at the hearing, the stock price of HGS actually declined 5.3% on the first trading day after the vote recommending approval.

93.     After the close of the market on December 2, 1010, HGS and GSK announced that the date for the FDA to decide on Benlysta approval had been rescheduled from December 9, 2010 to March 10, 2011.

94.     After the Advisory Committee hearing, investment analysts continued to expect FDA approval of Benlysta/belimumab, but worried about the "label."   Every FDA approved treatment is accompanied by a long document called a "label" that sets forth information for doctors and patients regarding indications, efficacy, and safety.   The contents must be approved by the FDA.

95.     In the case of Benlysta, investment analysts were concerned that it might receive a restrictive label.  Specifically, they were concerned that Benlysta would not be approved for African-American patients because the studies had shown very little evidence of efficacy in that sub-group.

96.     The FDA approved Benlysta/belimumab on March 9, 2011.  The approval did not mandate a restrictive label, as investment analysts had feared, and permitted Benlysta to be prescribed to African-American patients.  Accordingly, HGS's stock price increased 13% in one day.

97.     A March 10, 2011 J.P. Morgan analyst report stated that the FDA had approved Benlysta with a "favorable label" because Benlysta was not contraindicated in African-Americans, which represent 20%-30% of lupus patients.  The report stated that "we view the lack of exclusion of these patients in the label as a clear positive."

98.     Similarly, a Collins Stewart report that same day stated, "[w]e are encouraged by the unrestrictive label . . . .  While the label highlights the efficacy question in African Americans, it states to only use caution and that no definitive conclusions can be drawn."

99.     Although it did not proscribe use by African-Americans, the FDA label for Benlysta did (and still does) require a statement in the "Warnings and Precautions" section on the very first of 22 pages that warns "Depression: Depression and suicidality have been reported in BENLYSTA studies.  Patients should be instructed to contact their healthcare provider if they experience new or worsening depression, suicidal thoughts or other mood changes."

100.    On May 20, 2011, the Committee for Medicinal Products for Human Use ("CHMP") of the European Medicines Agency also approved Benlysta.  As a condition for approval, the EMA required HGS to conduct a five year safety study to assess adverse events of special interest, including "depression and suicide."

101.    On the date of this pleading, the defendants' Benlysta website states that "Benlysta can cause serious side effects, including . . . suicide . . . .  Symptoms can include thoughts of suicide or dying, attempting to commit suicide, thoughts of hurting yourself or others, trouble sleeping, new or worsening anxiety or depression, acting on dangerous impulses, and other unusual changes in your behavior or mood."  This statement is based upon the suicides and suicide attempts that defendants knew about, but concealed, during the Class Period.

102.    In light of the adverse event results disclosed by the FDA, some patients with SLE have indicated a reluctance to take Benlysta/belimumab because of concerns about suicide.  On Kendra's Blog[5], which gives a first person view of living with Lupus, the author's April 12, 2012 entry lists her "concerns about Benlysta," including "during clinical trials depressions was numerically more common with Benlysta than with placebo.  They even had 2 suicides."

103.    In part because of this reluctance, sales of Benlysta have been disappointing:

- September 22, 2011 Evaluate Pharma: "[HGS] Shares have dropped by nearly half since US approval of lupus drug Benlysta in March as ***disappointing*** initial sales numbers have prompted near-term forecasts to be reined in significantly"

- October 27, 2011 Zacks Equity Research: "***Disappointing*** sales of Human Genome's potential blockbuster lupus drug Benlysta pulled down [revenues] during the reported quarter"

- January 11, 2012 Pharmaletter: "Human Genome Sciences' Benlysta sales ***disappoint***."

[Emphasis added.]

---

[5]        http://kendraisola.blogspot.com (visited April 24, 2012).

## LOSS CAUSATION/ECONOMIC LOSS

104.    During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market. This artificially inflated the price of HGS securities and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of HGS securities fell precipitously as the prior artificial inflation came out of the price over time. As a result of their purchases of HGS securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

105.    HGS's verbal "Safe Harbor" warnings accompanying its oral forward-looking statement(s) ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

106.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of HGS who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying, or relating to, any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying, or relating to, any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET

107.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff, and other members of the Class, purchased HGS securities between the time the defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

108.     At all relevant times, the market for HGS securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, HGS filed periodic public reports with the SEC; and

(b)     HGS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## CLASS ACTION ALLEGATIONS

109.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the publicly traded securities of HGS during the Class Period (the "Class"), including all persons who acquired the common stock of HGS pursuant and/or traceable to the false and misleading July and December Registration Statements.  Excluded from the Class are defendants, directors, and officers of HGS and their families and affiliates.

110.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. HGS had more than 180 million shares outstanding, owned by thousands of persons.

111.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the prices of HGS securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

112.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

113.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

114.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against the Individual Defendants, HGS, and GSK

115.    Plaintiff repeats and realleges each and every allegation contained above.

116.    During the Class Period, defendants disseminated or approved the false statements specified above, which they recklessly disregarded or knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of HGS securities during the Class Period.

118.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HGS securities.  Plaintiff and the Class would not have purchased HGS securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

119.    As a direct and proximate result of the defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of HGS securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants and HGS

120.    Plaintiff repeats and realleges each and every allegation contained above.

121.    The Individual Defendants acted as controlling persons of HGS within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about HGS, the Individual Defendants had the power and ability to control the actions of HGS and its employees.  HGS controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages and interest;

C.        Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.        Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


DATED:  April 27, 2012                              SCOTT+SCOTT LLP


                                        *s/* Deborah Clark-Weintraub
                                        DEBORAH CLARK-WEINTRAUB (*pro hac vice*)
                                        500 Fifth Avenue, 40th Floor
                                        New York, NY 10110
                                        Tel.:  (212) 223-6444
                                        Fax:  (212) 233-6334
                                        Email:  dweintraub@scott-scott.com

                                        SCOTT+SCOTT LLP
                                        DAVID R. SCOTT (*pro hac vice*)
                                        156 South Main Street
                                        P.O. Box 192
                                        Colchester , CT 06415
                                        Tel.:  (860)-537-3818
                                        Fax:  (860)-537-4432
                                        Email:  drscott@scott-scott.com

                                            – and –

MARY K. BLASY (*pro hac vice*)
MATTHEW MONTGOMERY (*pro hac vice*)
707 Broadway, Suite 1000
San Diego, CA 92101
Tel.:  (619) 233-4565
Fax:  (619) 233-0508
Email: mblasy@scott-scott.com
        mmontgomery@scott-scott.com

BROWN, GOLDSTEIN & LEVY LLP
DANA W. MCKEE (04447)
GREGORY P. CARE (29040)
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel.:  (410) 962-1030
Fax:   (410) 385-0869
Email:  dwm@browngold.com
Email: gpc@browngold.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served upon the attorneys of record via electronic filing.


_____s/ Deborah Clark-Weintraub_____
DEBORAH CLARK-WEINTRAUB