IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| *In Re Human Genome Sciences, Inc. Securities Litigation* <br><br> _____ <br><br> THIS DOCUMENT RELATES TO: ALL ACTIONS | Civil Action No. 8:11-cv-03231-RWT <br><br> PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION TO DISMISS OF GLAXOSMITHKLINE PLC <br><br> <u>ORAL ARGUMENT REQUESTED</u> |

Lead Plaintiff Davin Pokoik ("Plaintiff") respectfully submits this memorandum in opposition of the Motion to Dismiss the Amended Consolidated Complaint ("the Complaint") filed by defendant GlaxoSmithKline PLC ("GSK") ("GSK Mem.").

## I. INTRODUCTION

During the Class Period, from July 20, 2009 through November 11, 2010, GSK and Human Genome Sciences, Inc. ("HGS") issued joint press releases touting the safety of Benlysta, a new treatment for Lupus they were developing. At the same time defendants were publishing favorable trial results, however, they were concealing certain unfavorable results, namely that in contrast to those taking placebo, five patients taking Benlysta in the trials had experienced suicidal episodes. When the FDA finally disclosed the unfavorable results, HGS's stock price declined over 10% in one day.

GSK does not deny that it was aware of the suicidal episodes at issue. Instead, GSK argues that it did not act with scienter because "GSK did not believe that the facts regarding the suicides

would have any bearing whatsoever on the commercial viability of Benlysta." GSK Mem. at 15. This is hard to believe. It seems self-evident that virtually any drug's commercial viability would be negatively impacted by an association with something as serious as suicide. Indeed, HGS' CEO Thomas Watkins admitted that Benlysta's perceived safety was "going to be a very important feature of commercialization." ¶70.[1] Moreover, the U.S. Supreme Court recently held that a cold treatment's association with lost sense of smell posed "a significant risk to [its] commercial viability." *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1323 (2011). If lost sense of smell poses such a risk, suicide certainly does.

GSK also argues that to the extent its press releases accurately reported favorable clinical trial results, its failure to disclose unfavorable results is not actionable. GSK is wrong. The securities laws forbid companies from selectively disclosing only favorable trial results and concealing the rest. For example, facing almost an identical situation, the court in *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369 (N.D. Ill. Feb. 7, 2003), denied a motion to dismiss where the defendants published positive Phase I trial results and concealed unfavorable Phase II results. Specifically, the court stated that, "If defendants knew that the Phase II tests had failed when they were touting the performance of the Phase I tests, a finder of fact could find the statements materially false." *Id*., at *12. Like the *Neopharm* defendants, GSK knew about undisclosed unfavorable results from previous studies, namely the suicidal episodes, at the same

---

[1] "¶__" or "¶¶__" refers to the Amended Consolidated Complaint filed on April 27, 2012 (the "Complaint"). ECF No. 25.

time it touted Benlysta's safety in later studies. As such, GSK's statements are similarly actionable.

For these reasons and for those set forth below, Plaintiff respectfully requests that the Court deny GSK's Motion to Dismiss in its entirety.

## II.  STATEMENT OF FACTS

In the interests of judicial economy, Plaintiff incorporates by reference the Statement of Facts set forth in Plaintiff's Memorandum in Opposition to the Motion to Dismiss of Human Genome Sciences, Inc. and the Individual Defendants (the "HGS Mem."). Plaintiff supplements that Statement of Facts as follows in order to elucidate GSK's role in defendants' fraud:

In August 2006, HGS and GSK entered into a definitive co-development and co-commercialization agreement under which HGS had responsibility for conducting the Benlysta Phase 3 trial, with assistance from GSK. ¶29. The companies agreed to share equally in Phase 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement. Pursuant to that agreement, GSK was entitled to, and did receive, the results of all clinical studies of Benlysta. *Id*. These results showed that five patients taking Benlysta in the clinical trials had suffered suicidal episodes while none taking placebo had done so. ¶72. Collectively, these episodes constituted a "safety signal" or possible causal relationship between Benlysta and suicide. ¶4.

The co-commercialization agreement stated that GSK and HGS would establish a number of joint committees to manage the development of Benlysta. ¶30. One such committee, the Product Safety Committee ("PSC"), was comprised of GSK and HGS employees and was tasked with managing the safety data from the Benlysta clinical trials. ¶31. In this regard, the PSC was

required to review all available blinded safety data and other safety issues. *Id*. The PSC also had responsibility for communicating any safety issues to the joint GSK/HGS committees in charge of Benlysta. *Id*. The co-commercialization agreement also called for GSK and HGS to create a master safety database which would cross-reference any Adverse Events, such as suicidal episodes, relating to Benlysta. ¶32.

On July 20, 2009, GSK and HGS issued a joint press release announcing the results of the BLISS-52 clinical trial of Benlysta. ¶37. The press release repeatedly stressed that the safety results were comparable between Benlysta and placebo:

> ***In BLISS-52, belimumab was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between belimumab and placebo treatment groups***. Serious infections were reported in 5.9% of patients on placebo and 6.1% of patients on belimumab. The most common adverse events were headache, arthralgia, upper respiratory tract infections, urinary tract infection and influenza, and were also comparable between belimumab and placebo treatment groups.

¶37.[2]

In response to this disclosure, HGS common stock price rocketed from $3.32 per share to $12.51 in one day, an increase of over 270%. ¶39. Throughout the Class Period, GSK and HGS jointly issued several more press releases stressing comparable safety results between Benlysta and placebo. ¶¶46, 48, 60, 66, 67. All of these releases failed to disclose the higher rates of suicidal episodes observed in patients taking Benlysta compared to those taking placebo. *Id*.

The Benlysta suicide safety signal was finally disclosed to investors by the FDA on November 12, 2010. As a result, the price of HGS securities dropped over 10% in one day. ¶82.

---

[2]   Unless otherwise noted, all emphasis is added and citations are omitted.

In April 2012, GSK made an unsolicited offer to purchase HGS, an offer which HGS rejected. ¶22.

## III.   ARGUMENT[3]

### A.   Applicable Standards

"'[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The Complaint easily passes muster under this standard.

### B.   The Complaint Properly Pleads GSK's Scienter

In the Fourth Circuit, scienter may "be established by a showing of recklessness." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003). In *Tellabs*, 551 U.S. 308, the U.S. Supreme Court held that a securities fraud plaintiff properly alleges scienter if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any

---

[3]   Plaintiff incorporates by reference all arguments he made in opposition to the HGS Defendants' Motion to Dismiss including, but not limited to, the HGS Defendants' arguments that the suicide data was disclosed.

opposing inference one could draw from the facts alleged." *In re Constellation Energy Group, Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 634 (D. Md. 2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499 (2007)). Thus, the question at hand is whether the facts alleged raise an inference of recklessness as compelling as any opposing inference. If the inferences are equally strong, Plaintiff prevails.

In this case, there is no dispute that GSK was contractually obligated to monitor the safety results of the Benlysta studies. ¶31. As such, there can be no question that GSK knew of the suicidal episodes observed in patients taking Benlysta. Likewise, there is no dispute that the suicidal episodes were not disclosed in the joint press releases. Nonetheless, GSK argues that the more plausible inference from its admitted failure to disclose this critical safety information is not fraud but that "GSK did not believe that the facts regarding the suicides would have any bearing whatsoever on the commercial viability of Benlysta . . . ." GSK Mem. at 15. This strains credulity. Suicidal episodes are by definition life-threatening. All else being equal, patients and doctors are going to look less favorably upon a drug associated with a higher rate of suicidal episodes than one that is not. Indeed, HGS' CEO Thomas Watkins admitted that Benlysta's perceived safety was "going to be a very important feature of commercialization." ¶70. Significantly, in *Matrixx*, the U.S. Supreme Court held that a cold treatment's association with lost sense of smell posed "a significant risk to the commercial viability of Matrixx's leading product." *Matrixx*, 131 S. Ct. at 1323. If an association with lost sense of smell poses a significant risk to commercial viability, an association with suicide certainly does.

In fact, the suicide safety signal did reduce Benlysta's commercial viability. After Benlysta was approved, the FDA required its label to include a suicide warning and some Lupus patients

6

expressed reluctance to take Benlysta because of the suicide issue. ¶¶99, 102. In part, because of this reluctance sales of Benlysta have been disappointing. ¶103. This casts further doubt on GSK's assertion that it believed Benlysta's suicide signal would have no bearing on its commercial viability. The more compelling inference is that GSK simply acted recklessly in failing to disclose the suicide signal to investors.

Unable to credibly defend its conduct, GSK attempts to argue that Plaintiff is required to plead that GSK had a "hidden agenda" in concealing the suicidal episodes, asserting that "Plaintiff never advances a theory of motive." GSK Mem. at 16. However, the U.S. Supreme Court has ruled that allegations of motive are not required to establish scienter. *Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal [to pleading scienter]"). Further, GSK's conduct allowed HGS to sell over $800 million in stock at artificially inflated prices. ¶6. At the same time, GSK had a vested interest in HGS as a result of the Benlysta partnership, ultimately attempting to acquire the whole company. ¶22. As such, GSK's reckless failure to disclose the Benlysta suicide signal to investors was at the very least consistent with its own self-interest in maintaining HGS as a financially viable partner.

GSK's reliance on *Sheehan v. Little Switzerland*, 136 F. Supp. 2d 301 (D. Del. 2001), is misplaced. In *Sheehan*, the court held that a potential acquirer that issued a truthful joint press release with the company it was proposing to acquire announcing a proposed merger could not be held liable for failing to disclose that the financing agreement that had been executed in anticipation of the merger would expire in three months. Although the court found that the omission of this information from the press release made ***subsequent statements*** by the company being acquired false and misleading because its shareholders may have believed that "the financing

7

was secure and the merger was more likely to occur" (*id.* at 310), the court held that the potential acquirer did not have a duty to disclose the omitted information. The court specifically distinguished the situation before it in *Sheehan* from the facts of *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276 (E.D.N.Y. 2000), in which a Section 10(b) claim against a potential acquirer by shareholders of the target company was sustained. In distinguishing the result in *MCI Worldcom*, the court in *Sheehan* reasoned that *MCI Worldcom* involved "an affirmative false representation," and stated that it "agree[d] that such a misrepresentation would be actionable under §10(b)." *Sheehan*, 136 F. Supp. 2d at 311. Here, unlike in *Sheehan*, GSK is alleged to have made affirmative misstatements in the joint press releases, specifically, that "[**s**]***tudy results also showed that [Benlysta] was generally well tolerated, with adverse event rates comparable between [Benlysta] and placebo treatment groups***." *See* ¶¶46, 48, 60, 63, 66-67.[4] Thus, the holding of *MCI Worldcom*, not *Shaheen*, is applicable.

---

[4] Significantly, these statements were attributed to GSK as well as HGS. *See*, *e.g.*, ECF No. 30-3 at 1 ("Human Genome Sciences, Inc. . . . ***and GlaxoSmithKline PLC*** today announced that BENLYSTA$^{TM}$ . . . met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 trials in patients with serologically active systemic lupus erythematosus (SLE). In the placebo-controlled BLISS-52 study, the results showed that belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate at Week 52, compared with standard of care alone. ***Study results also showed that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups***."). Substantially identical statements were made in the other joint press releases as well. *See* ¶¶46, 48, 60, 63, 66-67. Thus, GSK's assertion (*see* ECF No. 30-1 at 5-6) that its liability under *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, L. Ed. 2d 166 (2011), is limited only to those statements in the releases attributed to Dr. Carlo Russo, a senior vice president of GSK, is erroneous.

In light of all the relevant facts, the inference that GSK acted recklessly, or worse, is at least as compelling as any opposing innocent inference. As such, the Complaint properly alleges GSK's scienter.

### C.  GSK's Press Releases Were Materially Misleading

Under Section 10(b), "[d]isclosure is required . . . 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 131 S. Ct. at 1321. GSK argues that its press releases were not misleading for two reasons: (1) the suicidal episodes at issue were supposedly disclosed to investors, and (2) the press releases accurately reported the results of the trials they purported to describe. In fact, as demonstrated in Plaintiff's opposition to HGS' Motion to Dismiss, at best, defendants disclosed only two of the five suicidal episodes observed in Benlysta patients during the trials and even then, repeatedly described one of these as unrelated to Benlysta. *See* ECF No. 29-6 at 11. Plaintiff directs the Court to his memorandum in opposition to the HGS Defendants' Motion to Dismiss for a full discussion of this issue.

With regard to the accuracy of GSK's press releases, the law is clear: "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also Recupito v. Prudential Sec., Inc.*, 112 F. Supp. 2d 449, 455 (D. Md. 2000) ("The issue is not whether particular statements, taken separately, were literally true, but whether the

9

Prospectus, when read as a whole, would have misled a reasonable investor about the nature of the securities").[5]

In this case, GSK issued press releases stating that the safety results of certain studies showed comparable safety between Benlysta and placebo. At the same time, GSK knew full well that previous studies had shown more suicidal episodes in patients taking Benlysta and that these had never been reported. Further, GSK knew that the HGS Defendants were simultaneously telling investors that there were no safety signals for Benlysta. ¶¶54, 61. In this context, GSK's press releases led investors to believe that Benlysta was as safe as placebo and without any safety signals. For example, a Piper Jaffray analyst stated, "[d]ue to the clean safety profile, we expect Benlysta to be broadly used in the lupus setting." ¶40. Similarly, a JP Morgan analyst stated "we believe it's notable that no disconcerting safety signals have emerged." ¶49. That analysts were in fact misled demonstrates that GSK's press releases were misleading and actionable.

Numerous courts have held that it is misleading to publish favorable clinical results, even if accurate, and conceal inaccurate results. In *Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, the defendants reported accurate clinical results for the drug LEP but failed to disclose the adverse results of another clinical trial that had been completed. The court found defendants' statements actionable, stating:

---

[5]  The HGS Defendants concede that accurate statements can be rendered misleading by selective presentation, stating, "So that the Court will not be misled by the plaintiff's selection of snippets, the defendants are submitting a copy of the entire FDA briefing package with this memorandum . . .," and "So that the Court will not be misled by the plaintiff's selection of snippets, the defendants are submitting a copy of the entire transcript . . ." HGS Defs.' Mem. at 7, n.6, 10.

10

> With respect to the October 31 statement, defendants argue that this statement is technically correct, insofar as it refers to Phase I studies which actually did have the results listed. As mentioned above, however, while this statement may have been technically correct, plaintiff argues that it is misleading because defendants had knowledge that the Phase II tests were a failure at this point. If defendants knew that the Phase II tests had failed when they were touting the performance of the Phase I tests, a finder of fact could find the statements materially false.

*Id.*, at *11.

Similarly, in *In re Forest Laboratories Sec. Litig.*, No. 05 Civ. 2827, 2006 WL 5616712 (S.D.N.Y. July 21, 2006), the defendants, like GSK, were alleged to have published accurate, favorable study results while concealing unfavorable results showing that one of their drugs was associated with suicide. *Id.*, at *7. The court held such selective publication to be actionable: "Plaintiffs contend that Defendants misled investors by publishing clinical data favorable to Celexa while concealing unfavorable data . . . . If ultimately proven, these publications may be actionable under Section 10(b)." *Id.*[6]

Like the defendants in *Neopharm* and *Forest Laboratories*, GSK published favorable trial results fully aware of other, unfavorable results that had not been disclosed. Such cherry-picking can and did mislead investors notwithstanding the accuracy of the limited information GSK did disclose.

Finally, GSK argues that "companies are not required to be encyclopedic in their press releases nor include every already undisclosed fact." GSK Mem. at 2. Plaintiff agrees. In fact, GSK did not have to disclose any of the Benlysta study results to investors. *Matrixx*, 131 S. Ct. at

---

[6] *See also In re Geopharma, Inc. Securities Litigation*, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) (accurate press release held to be misleading in the context of previous releases); *In re Ribozyme Pharm., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156, 1162 (D. Colo. 2000) (same).

1321-22.  However, once a company chooses to speak, it must disclose any and all information necessary to prevent its statements from being misleading.  *Id.* at 1322.  In this case, the FDA summarized that information – the five suicidal episodes – in one paragraph.  ¶77.  GSK could have done the same, but chose not to.

## IV.     CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny GSK's motion to dismiss in its entirety.[7]

DATED:  June 22, 2012                                   BROWN, GOLDSTEIN & LEVY LLP
                                                        DANA W. MCKEE (04447)
                                                        GREGORY P. CARE (29040)


                                                        _____/s/ Dana W. McKee*[8]_____
                                                        120 E. Baltimore Street, Suite 1700
                                                        Baltimore, Maryland 21202
                                                        Tel.: 410/962-1030
                                                        Fax:  410/385-0869
                                                        Email:  dwm@browngold.com
                                                                gpc@browngold.com

---

[7] Should the Court decide to grant Defendants' motion to dismiss in any part, Plaintiff respectfully requests leave to amend.  "[L]eave to amend should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile."  *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

[8] * Dana W. McKee, Daniel S. Katz, James D. Mathias, and Kenneth J. Pfaehler have accepted the content of the document and authorized the use of their electronic signatures.

DATED:  June 22, 2012	SCOTT+SCOTT LLP
	DEBORAH CLARK-WEINTRAUB (*admitted pro hac vice*)

	             /s/ Deborah Clark-Weintraub

	500 Fifth Avenue, 40th Floor
	New York, NY 10110
	Tel.:  212/223-6444
	212/223-6334 (fax)
	Email:  dweintraub@scott-scott.com

	     and
	DAVID R. SCOTT
	156 South Main Street
	P.O. Box 192
	Colchester , CT 06415
	Tel.:  860-537-3818
	860-537-4432 (fax)
	Email:  drscott@scott-scott.com

	     and
	MARY K. BLASY
	707 Broadway, Suite 1000
	San Diego, CA 92101
	Tel.:  619/233-4565
	619/233-0508 (fax)
	Email:  mblasy@scott-scott.com

	*Plaintiff's Lead Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 22, 2012.

    /s/ Deborah Clark-Weintraub
Deborah Clark-Weintraub
SCOTT+SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel.:  212/223-6444
212/223-6334 (fax)
Email:  dweintraub@scott-scott.com